1
ROB BONTA
Attorney General of California
2
ANYA M. BINSACCA
Supervising Deputy Attorney General
3
KRISTIN A. LISKA (State Bar No. 315994)
JOE MEEKER (State Bar No. 336725)
4
Deputy Attorneys General
 300 South Spring Street, Suite 1702
5
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6502
6
 Fax:  (916) 731-2124
 E-mail:  Joe.Meeker@doj.ca.gov
7
*Attorneys for Defendant*
*Attorney General Rob Bonta*
8

9
IN THE UNITED STATES DISTRICT COURT

10
FOR THE CENTRAL DISTRICT OF CALIFORNIA

11
WESTERN DIVISION

12

| | |
|---|---|
| 13 **X.AI LLC,** | 2:25-cv-12295-JGB-SSC |
| 14 Plaintiff, | **DEFENDANT'S OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION** |
| 15 **v.** | |
| 16 **ROB BONTA, in his official capacity as Attorney General of the State of** | Date: February 23, 2026 |
| 17 **California,** | Time: 9:00 a.m. |
| | Courtroom: 1 |
| 18 Defendant. | Judge: The Honorable Jesus G. Bernal |
| 19 | Trial Date: Not scheduled |
| | Action Filed: 12/29/2025 |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction................................................................................................. 1

Background ................................................................................................... 2

    A.    Generative Artificial Intelligence ............................................. 2

    B.    AB 2013 ................................................................................... 3

    C.    Procedural History .................................................................. 5

Legal Standard ............................................................................................ 5

Argument ..................................................................................................... 5

    I.    xAI Has Not Established Standing .......................................... 5

    II.    xAI Has Not Shown a Likelihood of Success........................... 6

        A.    Takings Clause......................................................................... 7

            1.    xAI Cannot Receive Injunctive Relief for an
Alleged Takings Clause Violation ............................... 7

            2.    xAI Has Not Shown That It Holds Trade Secrets in
the Information It Identifies ........................................ 8

            3.    AB 2013 Does Not Effect an Unconstitutional
Taking of xAI's Trade Secrets ................................... 10

                a.    AB 2013 is not a per se taking ............................ 10

                b.    AB 2013 does not effect a regulatory taking ....... 11

                    (1)    AB 2013 does not frustrate
investment-backed expectations................ 12

                    (2)    xAI has not shown that disclosures
under AB 2013 will have significant
economic impacts ..................................... 13

                    (3)    AB 2013 serves an important public
purpose...................................................... 14

        B.    First Amendment ................................................................... 16

            1.    AB 2013 Regulates Commercial Speech ..................... 16

            2.    AB 2013 Is Constitutional Under the *Zauderer*
Standard for Compelled Commercial Speech ............... 18

            3.    In the Alternative, AB 2013 Is Constitutional as a
Regulation of Commercial Speech under
Intermediate Scrutiny ............................................... 20

        C.    Vagueness .............................................................................. 22

    III.    The Equities Do Not Favor Injunctive Relief ...................... 23

    IV.    Any Injunctive Relief Should Be Narrowly Tailored ........... 24

Conclusion ................................................................................................. 26

# TABLE OF AUTHORITIES

**Page**

CASES

*Agins v. Tiburon*
    447 U.S. 255 (1980) ........................................................................ 14

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
    916 F.3d 749 (9th Cir. 2019) ..................................................... 18, 19

*Am. Encore v. Fontes*
    152 F.4th 1097 (9th Cir. 2025) ...................................................... 6

*American Meat Inst. v. U.S. Dep't of Agriculture*
    760 F.3d 18 (D.C. Cir. 2014) ........................................................ 21

*Botosan v. Paul McNally Realty*
    216 F.3d 827 (9th Cir. 2000) ........................................................ 23

*Boutilier v. INS*
    387 U.S. 118 (1967) ...................................................................... 22

*California Redevelopment Ass'n v. Matosantos*
    53 Cal. 4th 231 (2011) .................................................................. 25

*CDK Glob. LLC v. Brnovich*
    16 F.4th 1266 (9th Cir. 2021) ....................................................... 15

*Cedar Point Nursery v. Hassid*
    594 U.S. 139 (2021) ................................................................ 10, 11

*ChromaDex, Inc. v. Elysium Health, Inc.*
    301 F. Supp. 3d 963 (C.D. Cal. 2017) ........................................... 8

*Coates v. City of Cincinnati*
    402 U.S. 611 (1971) ...................................................................... 23

*CTIA – The Wireless Ass'n v. City of Berkeley*
    928 F.3d 832 (9th Cir. 2019) ..................................................... 18, 19

*Desert Outdoor Advertising, Inc. v. City of Oakland*
    506 F.3d 798 (9th Cir. 2007) ........................................................ 11

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

4
*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) ................................................................ 24

5

6
*Fang Lin Ai v. United States*
   809 F.3d 503 (9th Cir. 2015) .................................................................. 22

7

8
*First Interstate Bank v. California*
   197 Cal. App. 3d 627 (1987) ................................................................... 8

9

10
*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
   455 U.S. 489 (1982) .............................................................................. 22

11
*Inteliclear, LLC v. ETC Glob. Holdings, Inc.*
   978 F.3d 653 (9th Cir. 2020) .................................................................... 9

12

13
*Klein v. City of San Clemente*
   584 F.3d 1196 (9th Cir. 2009) .................................................................. 5

14

15
*Knick v. Twp. of Scott*
   588 U.S. 180 (2019) ................................................................................ 7

16

17
*Kumar v. Koester*
   131 F.4th 746 (9th Cir. 2025) .................................................................. 6

18

19
*Lingle v. Chevron U.S.A. Inc.*
   544 U.S. 528 (2005) .............................................................................. 14

20

21
*Lucas v. South Carolina Coastal Council*
   505 U.S. 1003 (1992) ............................................................................ 13

22
*MAI Sys. Corp. v. Peak Computer, Inc.*
   991 F.2d 511 (9th Cir. 1993) .................................................................... 9

23

24
*Maryland v. King*
   567 U.S. 1301 (2013) ............................................................................ 24

25

26
*Mazurek v. Armstrong*
   520 U.S. 968 (1997) ................................................................................ 5

27

28
*Nat'l Ass'n of Wheat Growers v. Bonta*
   85 F.4th 1263 (9th Cir. 2023) ...................................................... 18, 19, 20

1

2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3

4

*Nationwide Biweekly Admin., Inc v. Owen*
  873 F.3d 716 (9th Cir. 2017) ................................................................. 19

5

6

*NetChoice v. Bonta*
  113 F.4th 1101 (9th Cir. 2024) ....................................................... 17, 18

7

8

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
  762 F.2d 1374 (9th Cir. 1985) ............................................................... 23

9

10

*Oregon Ass'n of Hosps. & Health Sys. v. Oregon*
  734 F. Supp. 3d 1139 (D. Or. 2024) ...................................................... 23

11

*Peace Ranch, LLC v. Bonta*
  93 F.4th 482 (9th Cir. 2024) .................................................................... 6

12

13

*Penn Central Transportation Co. v. New York City*
  438 U.S. 104 (1978) ............................................................................... 12

14

15

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
  153 F.4th 795 (9th Cir. 2025) ......................................................... passim

16

17

*Professional Compounding Centers of America, Inc. v. Sodergren*
  No. 25-cv-2799, 2026 WL 194519 (E.D. Cal. January 26, 2026) ...... 8

18

19

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*
  360 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................... 8

20

21

*PruneYard Shopping Ctr. v. Robins*
  447 U.S. 74 (1980) ................................................................................. 13

22

*Rose v. Locke*
  423 U.S. 48 (1975) ................................................................................. 23

23

24

*Ruckelshaus v. Monsanto Co.*
  467 U.S. 986 (1984) ...................................................................... 7, 8, 12

25

26

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*
  881 F.3d 1169 (9th Cir. 2018) ............................................................... 16

27

28

*Santa Barbara Sch. Dist. v. Superior Court*
  13 Cal. 3d 315 (1975) ............................................................................ 25

iv

# TABLE OF AUTHORITIES
### (continued)

Page

*Sheetz v. Cnty. of El Dorado*
    601 U.S. 267 (2024) .................................................................................. 11

*Spokeo, Inc. v. Robins*
    578 U.S. 330 (2016) ................................................................................ 5, 6

*Stormans, Inc. v. Selecky*
    586 F.3d 1109 (9th Cir. 2009) ................................................................ 24

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014) .................................................................................. 6

*Townley v. Miller*
    722 F.3d 1128 (9th Cir. 2013) .................................................................. 6

*Tremblay v. OpenAI*
    No. 3:23-cv-3223 (N.D. Cal. Sept. 24, 2024) .......................................... 9

*United States v. Stratics Networks Inc.*
    721 F. Supp. 3d 1080 (S.D. Cal. 2024) ................................................. 22

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
    425 U.S. 748 (1976) ................................................................................ 17

*Vivid Ent., LLC v. Fielding*
    774 F.3d 566 (9th Cir. 2014) .................................................................. 25

*Walker v. Univ. Books, Inc.*
    602 F.2d 859 (9th Cir. 1979) .................................................................... 9

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) ................................................................................ 23

*Weiss v. People ex rel. Dep't of Transportation*
    9 Cal. 5th 840 (2020) ................................................................................ 7

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .................................................................................. 5, 24

*X Corp. v Bonta*
    116 F.4th 888 (9th Cir. 2024) ................................................................ 17

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III .................................................................................. 5

U.S. Const. amend. I ....................................................................... *passim*

U.S. Const. amend. V ......................................................................... 8, 10

Cal. Const., art. I, § 19, subd. (a) ............................................................ 7

**STATUTES**

18 U.S.C. § 1839(3) ................................................................................ 8

Cal. Civ. Code
        § 3011 ............................................................................................. 4
        § 3011(b)(1) .................................................................................... 4
        § 3011(b)(2) .................................................................................... 4
        § 3011(b)(3) .................................................................................... 4
        § 3110(a)(12) ................................................................................ 13
        § 3110(b) ........................................................................................ 4
        § 3110(c) ........................................................................................ 4
        § 3111 ............................................................................................. 4
        § 3111(a) ................................................................................ *passim*
        § 3111(a)(3) .................................................................................... 9
        § 3426.1(d) ..................................................................................... 8

Assembly Bill 2013 ......................................................................... *passim*

**OTHER AUTHORITIES**

Ashley Altus, *Responsible enterprise LLMs: Addressing accuracy and
        [Large Language Model] bias challenges*, Outshift (May 6, 2024),
        https://outshift.cisco.com/blog/responsible-enterprise-llms-llm-bias ................. 2

Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for
        A.I.*, New York Times (Apr. 6, 2024),
        https://www.nytimes.com/2024/04/06/technology/tech-giants-
        harvest-data-artificial-intelligence.html ............................................... 3

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3
4
5
6

*Copyright and Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*, United States Copyright Office (May 2025), https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.................................................................3

7
8
9

Darrell M. West, *The coming AI Backlash will shape future regulation,* Brookings.edu (May 27, 2025), https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/ .........................................................12

10
11

*Data*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/data...................................................23

12
13

*Dataset*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/dataset ............................................23

14
15

Elon Musk, @ElonMusk, X.com (Jun. 25, 2025, 1:02 AM), https://x.com/elonmusk/status/1936333964693885089.......................15

16
17

Elon Musk, @ElonMusk, X.com (Jun. 21, 2025, 11:38 AM), https://x.com/elonmusk/status/1936493967320953090.....................15

18
19

Hadas Kotek et al., *Gender bias and stereotypes in Large Language Models* (Collective Intelligence Conference (CI '23)), https://dl.acm.org/doi/10.1145/3582269.3615599 .............................2

20
21
22

Jason Cohen, *Your Posts on X Are Being Used to Train Grok's Shenanigans.  Here's How to Stop it*, PCMag.com (Jan. 15, 2026), https://www.pcmag.com/how-to/your-tweets-x-posts-train-elon-musk-grok-ai-how-to-stop-it-opt-out ...............................................15

23
24
25

Madison Czopek, *Why does the AI-powered chatbot Grok post false, offensive things on X?*, Politifact (Jul. 10, 2025), https://www.politifact.com/article/2025/jul/10/Grok-AI-chatbot-Elon-Musk-artificial-intelligence/ ......................................15

26
27

Meghan J. Ryan, *Ghost-Hunting in AI and the Law* 99 Tul. L. Rev. 121 (2024).........................................................................2

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Scott J. Mulligan, *AI trained on AI garbage spits out AI garbage*, MIT
    Technology Review (Jul. 24, 2024),
    https://www.technologyreview.com/2024/07/24/1095263/ai-that-
    feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/
    (screenshot capture, https://perma.cc/B62C-FMPB) ........................................... 2

**INTRODUCTION**

Generative Artificial Intelligence is a revolutionary technology, and the effects of AI on society and the economy will only become more pronounced as models become more accessible. But this potential comes with risks. AIs are not infallible. Just like humans, AI models can exhibit bias and make mistakes. And users may not be able to detect those problems based on an AI model's outputs alone.

Because an AI's outputs are a function of the data the model was trained on, training data information can reveal a model's deficiencies and help users make informed decisions about which models to use. To that end, in 2024 the California legislature passed Assembly Bill 2013 (AB 2013), which requires AI developers who operate in California to disclose certain information about the data used to train their models. In addition to enabling the identification of potential biases, this transparency also allows Californians to see whether developers are being responsible stewards of potentially sensitive data, such as consumer and user information. The law went into effect on January 1, 2026, and tech companies—including the plaintiff here—have begun making disclosures pursuant to the statute.

Plaintiff xAI, an AI developer, contends that AB 2013 is unconstitutional in several ways, arguing that AB 2013 operates as an unconstitutional taking of its trade secrets, requires plaintiff to engage in compelled speech, and is unconstitutionally vague. xAI now seeks to preliminarily enjoin the statute on those grounds, and the court should reject its request. xAI is not likely to succeed on the merits of its constitutional claims. On the takings claim, xAI is not entitled to injunctive relief because it can seek compensation for the alleged taking. But even if injunctive relief were available, this claim fails on the merits. xAI has failed to meet its burden that AB 2013 requires it to disclose trade secrets, and the statute's limited disclosures serve the public interest. xAI's First Amendment claim fails because AB 2013 requires only the disclosure of factual and commercial information. And the statute provides sufficient guidance about what must be

disclosed to survive xAI's vagueness challenge.  The balance of equities also
weighs against an injunction here.  xAI waited more than a year after the statute
was passed to seek emergency relief, and it has already begun complying with the
statute, both of which demonstrate that it faces no irreparable harm from AB 2013's
enforcement.  xAI's motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    Generative Artificial Intelligence

Generative Artificial Intelligence ("generative AI") models are computer
programs capable of creating content, such as text and images, "without the need
for actual human intervention."  Meghan J. Ryan, *Ghost-Hunting in AI and the Law*
99 Tul. L. Rev. 121, 141 (2024).  These models are "trained" by being exposed to
large quantities of data.  *See id* at 142.  Generative AI models then draw on
patterns present within the training data to generate contextually relevant responses
to user prompts.  *Id.*   This means that generative AI models are "only as accurate,
reliable, or unbiased as the training data from which they're built."  *See* Ashley
Altus, *Responsible enterprise LLMs: Addressing accuracy and [Large Language
Model] bias challenges*, Outshift (May 6, 2024).[1]  Models may perpetuate or even
amplify biases found in the training data, including racial and gender stereotypes.
*See id.*; *see also* Hadas Kotek et al., *Gender bias and stereotypes in Large
Language Models* (Collective Intelligence Conference (CI '23)).[2]

The largest AI models train using the internet itself, including repositories of
billions of web pages.  *See* Scott J. Mulligan, *AI trained on AI garbage spits out AI
garbage*, MIT Technology Review (Jul. 24, 2024).[3]  But developers may also
incorporate training data from licensed or non-public sources.  *See Copyright and*

---

[1] *Available at* https://outshift.cisco.com/blog/responsible-enterprise-llms-llm-bias.
[2] *Available at* https://dl.acm.org/doi/10.1145/3582269.3615599.
[3] *Available at* https://www.technologyreview.com/2024/07/24/1095263/ai-that-feeds-on-a-diet-of-ai-garbage-ends-up-spitting-out-nonsense/ (screenshot capture available at https://perma.cc/B62C-FMPB).

2

*Artificial Intelligence Part 3: Generative AI Training (Pre-publication Version)*,
United States Copyright Office (May 2025).[4]  In the race to train generative AI
models, some developers have swept up sensitive or potentially objectionable data,
including copyrighted works that were not licensed for training, consumer and user
data, and even "synthetic data" that was itself generated by an AI model.  *See* Cade
Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, New York
Times (Apr. 6, 2024).[5]  Synthetic data may cause models to become less accurate
over time and lead to outputs with false information.  *See* Mulligan, *supra* at 2.

### B.    AB 2013

In light of the growing use of generative AI products and the importance of
training data to such products, the California Legislature enacted Assembly Bill
2013 (AB 2013) in September 2024.   As the author of the bill explained, "[m]any
consumers have valid questions about how these AI systems and services are
created, and if they truly are better than what they seek to replace."  Liska Decl.,
p. 11 (Ex. 1); *see also* Liska Decl., pp. 28-29 (Ex. 3).  In order to "build consumer
confidence" in AI products, the bill's author stated, "we need to start with the
foundations, and for AI that is the selection of training data."  *Id.*

AB 2013 is meant to "provide[] transparency to consumers of AI systems and
services by providing important documentation about the data used to train the
services and systems they are being offered, including if synthetic data has or is
being used to fill gaps in data sources."  Liska Decl., p. 11 (Ex. 1).  The legislature
reasoned that "requiring transparency about the training data used for AI systems
helps identify and mitigate biases, addressing hallucinations and other problematic
outputs, and shines the light on various other issues, such as privacy and copyright
concerns."  Liska Decl., p. 24 (Ex. 3).

---

[4]*Available at* https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.
[5] *Available at* https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

To this end, AB 2013 "impose[s] modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem." Liska Decl., p. 11 (Ex. 1). AB 2013 applies to developers of "generative artificial intelligence" systems and services. It defines "generative artificial intelligence" as "artificial intelligence that can generate derived synthetic content . . . that emulates the structure and characteristics of the artificial intelligence's training data." Cal. Civil Code § 3110(c).[6] In turn, "developer" is defined as "a person, partnership, state or local government agency, or corporation that designs, codes, produces, or substantially modified an artificial intelligence system or service for use by members of the public." § 3110(b).

Under AB 2013, the developer of a generative artificial intelligence system or service must post on their website "documentation regarding the data used by the developer to train the generative artificial intelligence system or service." § 3111. Such documentation must include, but is not limited to, "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service" that covers twelve specific categories of information. § 3111(a). These disclosure requirements apply to any generative artificial intelligence service or system released after January 1, 2022, and "made publicly available for Californians to use." § 3011. AB 2013 exempts from these disclosure requirements generative systems or services that general consumers are unlikely to use, specifically those "whose sole purpose is to help ensure security and integrity," or "whose sole purpose is the operation of aircraft in national airspace." § 3011(b)(1), (b)(2). It also exempts generative AI systems or services "developed for national security, military, or defense purposes" and those that are "made available only to a federal entity." § 3011(b)(3).

---

[6] All statutory references are to the California Civil Code unless otherwise specified.

4

## C.    Procedural History

Plaintiff xAI is a software company that develops generative AI models. Compl. ¶ 17 (Dkt. 1).  xAI filed suit against California Attorney General Rob Bonta, in his official capacity, challenging AB 2013 as a violation of the Takings Clause and First Amendment and as unconstitutionally vague. *Id.* ¶¶ 10-13.  After filing suit, xAI filed the instant motion for a preliminary injunction.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20.  xAI bears the burden of proving each element. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  It must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## ARGUMENT

xAI has failed to show that it is entitled to the extraordinary remedy it seeks. xAI has not established standing to bring this suit because xAI has already made disclosures pursuant to AB 2013.  But even if xAI had standing, xAI's constitutional claims fail on the merits.  And xAI's long delay in seeking preliminary relief demonstrates that there is no risk of irreparable harm.

## I.    xAI HAS NOT ESTABLISHED STANDING

For federal jurisdiction to exist, a plaintiff must have standing as required by Article III.  The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

1    favorable judicial decision." *Id.* "At the preliminary injunction stage, plaintiffs

2    must make a clear showing of each element of standing." *Townley v. Miller*, 722

3    F.3d 1128, 1133 (9th Cir. 2013).  The Ninth Circuit now applies a three-part test

4    drawn from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), to determine

5    if a plaintiff has established pre-enforcement standing.  *See Peace Ranch, LLC v.*

6    *Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) (adopting the *Driehaus* test).  Under this

7    test, "[a] plaintiff has a sufficient injury for a pre-enforcement challenge" when

8    they establish that they have (1) "'an intention to engage in a course of conduct

9    arguably affected with a constitutional interest'" that is (2) "'proscribed by a

10   statute'" and that (3) "'there exists a credible threat of prosecution thereunder.'"

11   *Kumar v. Koester*, 131 F.4th 746, 752 (9th Cir. 2025) (quoting *Driehaus*, 573 U.S.

12   at 158-59).

13        xAI has not established a credible threat that it will face prosecution for any

14   failure to comply with AB 2013, because it has not "adduced enough evidence to

15   show that there is a realistic threat that the law in question may be enforced against

16   *them*." *Am. Encore v. Fontes*, 152 F.4th 1097, 1118 (9th Cir. 2025) (emphasis

17   added).  After all, xAI *already has* made disclosures as required by AB 2013: it has

18   "provided a high-level, limited disclosure that does not reveal its trade secrets."

19   Pls. Br. n.1 (Dkt. 22); *see also* Liska Decl., pp. 55-56 (Ex. 6).  Rather than seeking

20   to avoid any compliance with AB 2013 whatsoever, xAI's concern is instead that

21   "California will find [its] disclosure insufficient" and that it might be "force[d] . . .

22   to disclose further details and reveal its trade secrets." *Id.*  This speculative threat

23   of harm is not sufficient to establish standing.

24   **II.    xAI HAS NOT SHOWN A LIKELIHOOD OF SUCCESS**

25        It is a plaintiff's burden to establish a likelihood of success on its claims.  It is

26   important to hold xAI to that burden here, where xAI waited over a year after AB

27   2013's passage to seek emergency relief.  Despite this, xAI has failed to establish a

28   likelihood of success on its Takings Clause, First Amendment, or vagueness claims.

### A.  Takings Clause

xAI is unlikely to succeed on the merits of its Takings Clause claim.  As a threshold matter, xAI cannot receive injunctive relief for this claim because it may seek compensation for any taking from the State.  Even so, xAI has failed to show that it has trade secrets that are subject to disclosure under AB 2013 or that such a disclosure would effect a taking.

### 1.  xAI Cannot Receive Injunctive Relief for an Alleged Takings Clause Violation

"[E]quitable relief is generally unavailable" to remedy a taking.  *Knick v. Twp. of Scott*, 588 U.S. 180, 201 (2019).  This is because "nearly all state governments provide just compensation remedies to property owners who have suffered a taking[.]"  *Id.*  If "an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."  *Id.*  This principle applies even when the subject of the taking is a trade secret.  *See Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1019 (1984) (injunctive relief unavailable for alleged taking of trade secrets where plaintiff could seek compensation in Court of Federal Claims).

To the extent that xAI contends that it has a property interest in trade secrets that are threatened by disclosure under AB 2013, xAI may seek compensation for the alleged taking in a suit against the State, making injunctive relief unavailable.  California law expressly allows parties to seek just compensation for takings of property.  *See Weiss v. People ex rel. Dep't of Transportation*, 9 Cal. 5th 840, 853 (2020) ("The California Constitution gives property owners the right to have a jury determine the compensation they are owed when a public entity takes or damages their property." (citing Cal. Const., art. I, § 19, subd. (a))).

 xAI contends that injunctive relief is appropriate because AB 2013 "does not contemplate any means" to provide compensation.  Pl.'s Br. at 14-15.  But xAI could seek compensation through a standard inverse condemnation suit in state

court.  Such suits may be brought for takings of personal property.  *See First Interstate Bank v. California*, 197 Cal. App. 3d 627, 635 (1987).  xAI does not explain why such a suit against the State is inadequate to obtain just compensation for the alleged taking of its trade secrets.  *See Professional Compounding Centers of America, Inc. v. Sodergren*, No. 25-cv-2799, 2026 WL 194519, *9-10 (E.D. Cal. January 26, 2026) (injunctive relief unavailable for alleged state taking of trade secrets because plaintiff did not "allege[] it will be prevented from bringing suit" against California to recover just compensation.).  Accordingly, xAI's request for injunctive relief on the basis of a Takings Clause violation should be denied.

### 2. xAI Has Not Shown That It Holds Trade Secrets in the Information It Identifies

It is true that confidential information may be protectable property under the Fifth Amendment to the extent that the information is "cognizable as a trade-secret property right under [state] law."  *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 832 (9th Cir. 2025) (hereinafter "*PhRMA*") (quoting *Ruckelshaus*, 467 U.S. at 1003-04 (alteration in original)).  However, xAI fails to show that it holds a trade-secret property right in the information that, it contends, AB 2013 requires it to further disclose. *Cf. Ruckelshaus*, 467 U.S. at 1001-02 (finding a taking where parties stipulated that information to be disclosed "contains or relates to trade secrets[.]")

Under both federal and California law, information is a trade secret if it (1) is valuable because it is unknown to others and (2) the owner has attempted to keep the information secret.  *See* Cal. Civ. Code § 3426.1(d); 18 U.S.C. § 1839(3); *see also ChromaDex, Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 971 (C.D. Cal. 2017) (providing that state and federal law share "substantially similar definition[s]" of a trade secret).  If information is publicly available or widely known in an industry, it is not a trade secret.  *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) (citing *Walker v.*

*Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979)).  To prove ownership of trade

secrets, a party "must identify the trade secrets and carry the burden of showing that

they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir.

1993).[7]  Trade secrets must be identified with sufficient particularity to allow a

factfinder to determine whether the information is, in fact, a trade secret.  *See*

*Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020).

xAI's assertions are too vague to identify a trade secret that AB 2013 requires

to be disclosed.  Although xAI argues that the industry generally treats training data

as confidential, it cites no authority that such "training data" is categorically entitled

to trade secret protection.[8]  And xAI does not adequately support its claim that

training data sources are valuable because they are unknown to others.  xAI

acknowledges that developers use data that is common to all developers, *see*

Stanley Decl, ¶ 10 (Dkt. 22-2), and it provides only conclusory statements about the

competitive importance and effect of supplemental data.  *See id.*, ¶¶ 21-23.  xAI

only speculates about the extent to which AB 2013's limited disclosures would

allow competitors to discover the sources of xAI's data or what the data is being

used for.  *See id.*, ¶ 23.  Moreover, xAI does not even expressly assert that it uses

unique or unknown data sets that would qualify as trade secrets.  Nor does xAI

provide evidence that disclosure of a "general range" of the number of data points

in its training datasets, *see* § 3111(a)(3), would actually reveal the existence of

datasets that are not already widely known in the industry.  *Cf. Inteliclear*, 978 F.3d

at 660 (plaintiff demonstrated that its alleged trade secrets were "unique in the

industry.").

---

[7] Although these cases deal with trade secret misappropriation claims, what a plaintiff must show to demonstrate the existence of a trade secret informs whether xAI has asserted an intellectual property right under state and federal law.

[8] Although xAI states that "courts around the country" have "recognized" the "trade-secret rights inherent" to dataset information, see Pl's. Br. at 12, its only authority for that statement is a single case where a court entered a stipulated protective order providing how the parties in that case would treat training data information in discovery. *See Tremblay v. OpenAI*, No. 3:23-cv-3223 (N.D. Cal. Sept. 24, 2024), Dkt.182, at 2.

Similarly, although xAI avers that it has developed "its own internal system of cleaning datasets," *see* Stanley Decl., ¶ 25, it provides no explanation of what that system is or whether those processes are actually unique in the industry—let alone that providing a "high level summary" of that process, *see* § 3111(a), would reveal any trade secrets.

xAI's conclusory assertions are not specific or substantive enough to establish that it has trade secrets in its dataset information.  This Court should reject xAI's invitation to enjoin the statute on the basis of a supposed taking when xAI has not established that the statute requires disclosure of its trade secrets.

### 3.    AB 2013 Does Not Effect an Unconstitutional Taking of xAI's Trade Secrets

Even if AB 2013 requires xAI to disclose trade secrets, it has not established that the disclosure operates as a taking.  The Supreme Court has identified two types of Fifth Amendment takings: "per se" takings and "regulatory" takings.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021).  A per se taking occurs when the government "physically acquires private property for a public use."  *Id.* at 147-48.  A regulatory taking occurs when the government "imposes regulations that restrict an owner's ability to use his own property."  *Id.* at 148.  AB 2013 is not a taking under either standard.

#### a.    AB 2013 is not a per se taking

xAI contends that AB 2013 operates as a "per se" taking because mandatory disclosure of trade secrets vitiates the fundamental right to exclude others from one's property and extinguishes the value of the trade secrets.  This argument is foreclosed by recent Ninth Circuit precedent.  *See PhRMA*, 153 F.4th at 833.  In *PhRMA*, the plaintiffs argued that the government-mandated disclosure of their trade secrets was a "per se" taking, despite the lack of a physical seizure, because it denied plaintiffs all economically beneficial use of those secrets.  *Id*.  The Ninth

10

1   Circuit rejected that argument and held that the claim was properly characterized

2   "as a potential regulatory taking." *Id.* at 834.

3       Plaintiff does not acknowledge this part of *PhRMA*, let alone attempt to

4   distinguish it from the claims here.  Instead, xAI relies on cases where courts found

5   per se takings dealing with the right to exclude from *land*—not access to

6   information.  *See Sheetz v. Cnty. of El Dorado,* 601 U.S. 267, 274 (2024)

7   (discussing land use regulation); *Cedar Point Nursery*, 594 U.S. at 149 (discussing

8   the right to access physical property).  But the Ninth Circuit rejected the analogy of

9   takings of land to takings of trade secrets in *PhRMA.* 153 F.4th at 833.  Because

10  there is no physical property implicated here, xAI's per se takings claim fails.

11              **b.    AB 2013 does not effect a regulatory taking**

12       xAI's regulatory takings claim also fails.  In assessing whether AB 2013

13  effects a regulatory taking, it is relevant that xAI's suit is best understood as a pre-

14  enforcement facial challenge to AB 2013.  Although xAI alleges that AB 2013 is

15  unconstitutional both facially and as applied to xAI, it makes no argument that AB

16  2013 may be "capable of valid application to others" or even to xAI itself under

17  different circumstances.  *See Desert Outdoor Advertising, Inc. v. City of Oakland*,

18  506 F.3d 798, 805 (9th Cir. 2007).  So although xAI seeks to enjoin enforcement of

19  AB 2013 only as to itself, its suit is ultimately a "claim[] of facial invalidity" that

20  "rest[s] on speculation about the law's coverage and its future enforcement."

21  *PhRMA*, 153 F.4th at 834 (citations and quotation marks omitted).  Such pre-

22  enforcement challenges "threaten to short circuit the democratic process by

23  preventing duly enacted laws from being implemented in constitutional ways." *Id.*

24  (citations and internal quotation marks omitted).  For this reason, courts impose a

25  high burden on plaintiffs asserting such pre-enforcement challenges: xAI must

26  show that AB 2013 operates as an unlawful taking under every possible application

27  of the law.  *See id.*

28

In the absence of any enforcement action, xAI has not shown that AB 2013 requires it to disclose trade secrets in every instance. But even if AB 2013 does require developers to disclose trade secrets, those mandatory disclosures are not a taking. Pursuant to *Penn Central Transportation Co. v. New York City*, in deciding whether a regulatory taking has occurred, courts consider (1) the regulation's interference with reasonable investment-backed expectations, (2) the economic impact of the regulation, and (3) the character of the government action. 438 U.S. 104, 124 (1978); *see also PhRMA,* 153 F.4th at 834. All three factors counsel that AB 2013 does not effect a taking.

### (1)    AB 2013 does not frustrate investment-backed expectations

xAI contends that AB 2013 is a taking because it made investments in AI and dataset development with the expectation that its dataset information would remain confidential. But xAI has not shown that its AB 2013 disclosures will upset reasonable investment-backed expectations "in every instance," *see PhRMA*, 153 F.4th at 834, or even in *this* instance, for two main reasons. First, as explained above, *see supra* at 8-10, xAI has not shown that AB 2013 requires it to disclose any trade secrets. Second, investment-backed expectations are "necessarily tempered" in areas "'that have long been the source of public concern and the subject of government regulation.'" *See PhRMA.*, 153 F.4th at 834 (quoting *Ruckelshaus*, 467 U.S. at 1007). Although generative AI is novel, it is clearly a subject of public concern, with increasingly prevalent calls for government regulation and transparency. *See*, *e.g.*, Darrell M. West, *The coming AI Backlash will shape future regulation,* Brookings.edu (May 27, 2025).[9] In light of the potentially world-changing consequences of the technology's rapid adoption and the robust public debate about AI safety, xAI should have expected that it would face increased regulatory scrutiny. *See Lucas v. South Carolina Coastal Council*,

---

[9] *Available at* https://www.brookings.edu/articles/the-coming-ai-backlash-will-shape-future-regulation/

505 U.S. 1003, 1027-28 (1992) ("by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless[.]").  Because xAI should have expected that it would be required to make the sorts of limited disclosures contemplated by AB 2013, those disclosures do not upset xAI's investment-backed expectations.

### (2)    xAI has not shown that disclosures under AB 2013 will have significant economic impacts

Nor has xAI shown that disclosures under AB 2013 will have significant economic impacts.  To prevail on this factor, xAI must demonstrate that the regulation "will unreasonably impair the value or use of [the plaintiff's] property." *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980).  xAI cannot show that every disclosure made pursuant to AB 2013 "will necessarily disclose the information that provides the trade secret owner with its 'competitive edge.'" *PhRMA*, 153 F.4th at 834.  While it is true that, as xAI notes, compilations of public information, when combined in a novel way, can be a trade secret, *see* Pl's. Br. at 11, when a trade secret comprises a compilation of information, revealing "a *portion* of the data making up [a] claimed trade secret" does not necessarily destroy the trade secret's economic value.  *PhRMA*, 153 F.4th at 834 (emphasis added). For example, information about individual datasets that xAI uses in training would not necessarily reveal xAI's trade secrets about those datasets in combination.  This conclusion is bolstered by the fact that AB 2013 requires only a "high-level summary" of xAI's datasets.  And although the statute identifies specific pieces of information to be disclosed, xAI has not demonstrated that revealing each of those individual data points—for example, whether the dataset includes synthetic information, *see* § 3110(a)(12)—would disclose any trade secrets whatsoever. Because xAI has not shown that every AB 2013 disclosure would significantly

1  diminish the value of its trade secrets, this factor does not support xAI's facial

2  takings claim either.

3            **(3)    AB 2013 serves an important public purpose**

4        Finally, the character of the governmental action at issue counsels that AB

5  2013 does not effect a taking.  In evaluating this factor, courts consider whether the

6  government action "affects property interests through some public program

7  adjusting the benefits and burdens of economic life to promote the common good."

8  *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 539 (2005) (internal quotation marks

9  omitted).  This analysis "necessarily requires a weighing of private and public

10  interests." *Agins v. Tiburon*, 447 U.S. 255, 260-61 (1980).  The character of the

11  government action weighs against finding a taking where a significant public

12  interest in the regulation outweighs a property owner's private interest in its use of

13  the property.  *See PhRMA*, 153 F.4th at 834.

14        This factor weighs against xAI because AB 2013 serves important public

15  purposes, including informing individuals about how their data is used to train AIs,

16  making users and copyright owners aware of whether models were trained on

17  copyrighted material, and allowing users to evaluate training data for biases and

18  other flaws.  A model trained on biased data may reproduce those biases, and a

19  model trained on synthetic data may have a greater propensity to hallucinate.  *See*

20  Mulligan, *supra* at 2.  Transparency about the data used to train these models will

21  help users make informed decisions about which generative AI systems they use

22  and trust.

23        xAI's own flagship generative AI, "Grok," provides a good example of the

24  value of training-data disclosure.  Specifically, it has been widely reported that

25  Grok was trained, at least in part, on posts from users on the social media platform

26  "X" (formerly Twitter).  *See* Jason Cohen, *Your Posts on X Are Being Used to*

27

28

*Train Grok's Shenanigans. Here's How to Stop it*, PCMag.com (Jan. 15, 2026).[10]
In June 2025, xAI CEO Elon Musk asked X users to "reply to this post with
divisive facts for @Grok training. By this I mean things that are politically
incorrect but nonetheless factually true."[11] Later Musk posted that Grok would
need to be entirely retrained because there was "too much garbage in any
foundation model trained on uncorrected data."[12] In a widely reported incident a
few weeks later on July 8, 2025, Grok made a number of antisemitic posts (since
deleted) wherein it praised Adolf Hitler, called itself "MechaHitler," and stated that
Hitler would "act decisively" to solve the problem of "anti-white hate" purportedly
espoused by Jewish people. *See* Madison Czopek, *Why does the AI-powered
chatbot Grok post false, offensive things on X?*, Politifact (Jul. 10, 2025).[13] Some
experts have suggested that Grok's training, and the material it aggregated from X,
"likely played a role in its spew of hate speech." *Id.*

Regardless of whether Grok's posts were, in fact, the result of training on
"politically incorrect" and "divisive" posts, the controversy demonstrates why the
public should know what data trains the AI models they use. Grok's hateful posts
were particularly egregious examples of a generative AI demonstrating bias. But
not all biased outputs will be as easily identified. In those instances, knowledge of
how a model was trained can help users make an informed choice about a model's
trustworthiness, even in the absence of obviously biased outputs.

The bottom line is that AB 2013 serves an important public purpose. The
Legislature decided that in light of the risks posed by AI, AI developers must make
limited disclosures about the data driving their systems. *See CDK Glob. LLC v.*

---

[10] *Available at* https://www.pcmag.com/how-to/your-tweets-x-posts-train-elon-musk-grok-ai-how-to-stop-it-opt-out.
[11] @ElonMusk, X.com (Jun. 21, 2025, 11:38 AM), https://x.com/elonmusk/status/1936493967320953090.
[12] @ElonMusk, X.com (Jun. 25, 2025, 1:02 AM), https://x.com/elonmusk/status/1936333964693885089.
[13] *Available at* https://www.politifact.com/article/2025/jul/10/Grok-AI-chatbot-Elon-Musk-artificial-intelligence/.

15

*Brnovich*, 16 F.4th 1266, 1283 (9th Cir. 2021) (no taking where legislature determined that challenged law "promotes the common good through the advancement of consumer privacy and competition.").  The public's interest in transparency outweighs xAI's interests in its alleged trade secrets.

Because the *Penn Central* factors support the conclusion that AB 2013 does not constitute an unlawful taking, this court should conclude that xAI is unlikely to succeed on the merits of its Takings Clause claim.

## B.    First Amendment

xAI further contends that AB 2013 violates the First Amendment because it compels speech.  Not so.  AB 2013 is a regulation of commercial speech that comports with the First Amendment, and xAI is not likely to succeed on the merits of this claim.

### 1.    AB 2013 Regulates Commercial Speech

Ordinarily, "[a] direct disclosure requirement . . . is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny." *PhRMA*, 153 F.4th at 810.  However, a different standard applies when "the content of the direct disclosure requirement qualifies as 'commercial speech,' which is entitled to less constitutional protection." *Id.*  "If the direct disclosure requirement regulates 'commercial speech,' then courts apply either intermediate scrutiny, or a lower level of scrutiny akin to rational basis review." *Id.* at 810-811 (internal citations omitted).  Although the question of whether a particular law regulates commercial speech is fact-specific, the Ninth Circuit has consistently held that disclosures of "product-specific economic information" are regulations of commercial speech. *Id.* at 821 (law requiring prescription drug manufacturers to report information on pricing to government regulated commercial speech); *see also San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1176 (9th Cir.

16

2018) (ordinance requirement that landlords disclose list of tenants' rights organizations to tenants regulated commercial speech).

AB 2013 requires the disclosure of "product-specific, economic information about [a developer's] products" and is therefore a regulation of commercial speech. *PhRMA*, 153 F.4th at 823.  Under AB 2013, developers are required to provide a list of information regarding the datasets used to train their generative AI products, such as information regarding the size of the dataset, whether the dataset contains synthetic information, or whether the data in the dataset was cleaned or manipulated.  *See* § 3111(a).  All of this information relates to the AI products that developers have made available for consumer use, and the disclosure of this information provides consumers with information they can rely on when deciding whether to use a generative AI product or which generative AI product to use. Thus, AB 2013 "improves the 'free flow of commercial information'" for consumers.  *PhRMA*, 153 F.4th at 822 (quoting *Va. State Bd. of Pharmacy*, 425 U.S. 748, 764 (1976)).  Just like a law requiring the disclosure of ingredients in food or specific chemicals in products, AB 2013 requires disclosure of the inputs into a product: the datasets used to train generative AI products.  Such speech is commercial speech.

Nor does AB 2013 suffer from the flaws that led the Ninth Circuit to strike down the reporting requirements at issue in *X Corp. v Bonta*, 116 F.4th 888 (9th Cir. 2024), and *NetChoice v. Bonta*, 113 F.4th 1101 (9th Cir. 2024).  In both of those cases, the Ninth Circuit held that the law at issue required companies to disclose "subjective and political or ideological" information.  *PhRMA*, 153 F.4th at 818.  For instance, in *X Corp.*, the law "required social media companies to identify what they believed to be 'Hate speech or racism,' 'Extremism or radicalization,' 'Disinformation or misinformation' and 'Foreign political interference,' which is an intensely political exercise."  *Id.* (discussing *X Corp.*, 116 F.4th at 902).  Similarly, in *NetChoice*, the law at issue required companies to "opin[e] on whether and how

controversial categories of content should be moderated." *NetChoice*, 113 F.4th at 901.  AB 2013 does not require developers to "opine on fraught political issues[.]'" *PhRMA*, 153 F.4th at 823.  Nor does it require developers to "express any . . . normative view about" their products or to "define their [products] in value-laden, state prescribed language." *Id.*  Instead, it solely requires developers to disclose "product-specific, economic information about their products," namely objective information regarding the datasets used to train their generative AI products.  *Id.* That is a classic regulation of commercial speech.

### 2.    AB 2013 Is Constitutional Under the *Zauderer* Standard for Compelled Commercial Speech

While courts apply intermediate scrutiny "in commercial speech cases where the government acts to restrict or prohibit speech," they apply a different standard "to compelled, as distinct from restricted or prohibited, commercial speech," known as the *Zauderer* standard.  *CTIA – The Wireless Ass'n v. City of Berkeley,* 928 F.3d 832, 842 (9th Cir. 2019); *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) (*"Zauderer* provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech.").  To withstand scrutiny under *Zauderer*, the compelled commercial speech must be "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage Ass'n*, 916 F.3d at 756.

AB 2013 meets these requirements.  First, the disclosures required under AB 2013 are purely factual.  Each of the categories of information that AB 2013 specifies should be included in the high-level summary are objective, factual inquires—e.g., whether the dataset includes data protected by intellectual property law, whether the dataset includes personal or aggregate consumer information, and how the dataset furthers the purpose of the generative AI product, *see* § 3111(a). Since AB 2013 requires only the "disclosure of accurate, factual information," it

1    meets the first requirement of *Zauderer*. *Nat'l Ass'n of Wheat Growers v. Bonta*,

2    85 F.4th 1263, 1267 (9th Cir. 2023).

3        Second, the required disclosures under AB 2013 are noncontroversial.  The

4    information that developers must post provide background details on the datasets

5    used to train generative AI.  There is nothing controversial about the number of data

6    points in a dataset or the types of data points included in a dataset.  AB 2013 does

7    not, for instance, require a developer to take a position "in a heated political

8    controversy" or "convey a message fundamentally at odds with its mission," *CTIA*,

9    928 F.3d at 845.  Nor does it require a developer to wade into an ongoing scientific

10    or technical debate.  *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1269 (required

11    warning was controversial in light of existing scientific debate about whether

12    chemical caused cancer).  Since AB 2013 only requires the disclosure of objective,

13    noncontroversial facts about a developer's generative AI product's training dataset,

14    it meets the second requirement of *Zauderer*.

15        Third, AB 2013 is not unduly burdensome or unjustified.  The Legislature was

16    clear that the purpose of AB 2013 was to provide consumers with useful

17    information regarding generative AI products.  *See supra* at 3-4.  Thus, AB 2013 is

18    not unjustified.  Nor is it unduly burdensome.  "A disclosure is 'unduly

19    burdensome' when the burden 'effectively rules out' [any] speech it accompanies."

20    *Nationwide Biweekly Admin., Inc v. Owen*, 873 F.3d 716, 734 (9th Cir. 2017)

21    (citation omitted).  AB 2013 does not "interfere with advertising or threaten to

22    drown out messaging by the [developers] subject to the requirement." *CTIA*, 928

23    F.3d at 949; *cf. Am. Beverage Ass'n*, 916 F.3d at 757 (required warning taking up

24    20% of package was unduly burdensome and drowned out manufacturer's own

25    speech on package).  Rather, AB 2013 "do[es] not rule out [xAI's] ability" to speak

26    "effectively or otherwise" on any topic it wishes to.  *Nationwide Biweekly*, 873 F.3d

27    at 734.  It is therefore not unduly burdensome and meets the third *Zauderer*

28    requirements.  AB 2013 is thus constitutional under *Zauderer*.

### 3.    In the Alternative, AB 2013 Is Constitutional as a Regulation of Commercial Speech under Intermediate Scrutiny

In the alternative, AB 2013 is constitutional under the intermediate scrutiny standard applicable to commercial speech.  For AB 2013 to survive intermediate scrutiny as a regulation of commercial speech, it must (1) "directly advance[] a substantial governmental interest" and (2) be "not more extensive than necessary to serve that interest."  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282-83.  AB 2013 meets this standard.

First, AB 2013 directly advances a substantial governmental interest.  The law's purpose is to provide consumers and users of generative AI products with important information related to the products they might use.  This is not merely "transparency for its own sake."  *PhRMA*, 153 F.4th at 826.  Rather, as the bill's author explained, AB 2013 requires the disclosure of information that consumers can use "to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service."  Liska Decl., p. 11 (Ex. 1). After all, the dataset used to train generative AI plays a central role in how the generative AI product will work in the future.  *See* Mulligan, *supra* at 2. Shortcomings in the dataset used—such as a dataset that contains child sex abuse materials or synthetic data—can lead to shortcomings in the generative AI product. *See id.*; *see also* Liska Decl., pp. 8-11 (Ex. 1); *id.* pp. 25-29.  Moreover, consumers of generative AI products are often operating at an information deficit given the reluctance of companies to provide information regarding the datasets used to train their products—a practice that has led to widespread calls for greater disclosure and transparency from experts and academics, *see* Liska Decl, pp. 25-28 (Ex. 3).  As the Ninth Circuit has recognized, "[t]he State has a substantial interest in reducing those asymmetries, facilitating informed commercial transactions, and improving

20

the efficiency of the [generative AI] market." *PhRMA*, 153 F.4th at 826.  AB 2013
furthers that substantial interest.

After all, contrary to xAI's argument, the information that AB 2013 requires
disclosed is of use to consumers. The use of synthetic data in a training dataset, for
instance, might raise concerns for consumers about the viability of a generative AI
product—the legislative history notes, for instance, examples of the use of synthetic
data leading to a generative AI product breaking down over time, *see* Liska Decl.,
pp. 10-11 (Ex. 1).  Consumers may also have greater confidence in a generative AI
product that uses a larger dataset for training or a product that uses data collected
over a longer window of time, both pieces of information within the scope of AB
2013.  And consumers looking for generative AI to perform specialized tasks may
find it useful to know the labels or characteristics of data in the dataset—for
instance, whether the dataset contains images versus text would matter to a
consumer looking for a generative AI product to create images.  Given the critical
role that datasets play in training generative AI and the large role generative AI
products play in modern life, the State has a substantial interest in providing
consumers with pertinent factual information regarding these products.

Second, AB 2013 meets the tailoring requirement of intermediate scrutiny.
After all, "to the extent that the government's interest is in assuring that consumers
receive particular information," the "means-end fit is self-evidently satisfied when
the government acts only through a reasonably crafted mandate to disclose 'purely
factual and uncontroversial information' about attributes of the product or service
being offered." *American Meat Inst. v. U.S. Dep't of Agriculture*, 760 F.3d 18, 26
(D.C. Cir. 2014).  That is precisely what AB 2013 does.  Moreover, all that AB
2013 requires is a "high level summary" of certain information.  *See* § 3111(a).  AB
2013 does not require companies to disclose the underlying datasets themselves.
And under AB 2013, developers "remain free to disseminate their own messages
directly to consumers and to the public at large." *PhRMA*, 153 F.4th at 828.

1    Overall, AB 2013 imposes no more onerous a disclosure regime than the numerous

2    other laws that require public disclosure of information related to a business's

3    products.  Just like those laws, AB 2013 is a constitutional regulation of

4    commercial speech.

5        **C.    Vagueness**

6        xAI is unlikely to succeed on the merits of its "void for vagueness" claim

7    because AB 2013 provides adequate notice of what is required under the statute.

8    The void-for-vagueness doctrine applies to both criminal and civil statutes, but civil

9    laws generally receive less exacting vagueness scrutiny. *See Hoffman Estates v.*

10   *Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 498-99 (1982) ("The degree of

11   vagueness that the Constitution tolerates—as well as the relative importance of fair

12   notice and fair enforcement—depends in part on the nature of the enactment.").

13       "In reviewing a business regulation for facial vagueness, [] the principal

14   inquiry is whether the law affords fair warning of what is proscribed." *Id.* at 489.

15   And "[i]n the context of civil statutes regulating economic activity, the standard [for

16   fair notice] is sufficiently low that statutes are unconstitutionally vague only where

17   they are 'so vague and indefinite as really to be no rule or standard at all.'" *United*

18   *States v. Stratics Networks Inc*., 721 F. Supp. 3d 1080, 1112 (S.D. Cal. 2024)

19   (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Fang Lin Ai v. United*

20   *States*, 809 F.3d 503, 514 (9th Cir. 2015) ("the question is whether the scheme that

21   subjects Appellants to FICA taxes is 'so vague and indefinite as really to be no rule

22   or standard at all.'").

23       With those standards in mind, AB 2013 is not unconstitutionally vague.  The

24   statue provides a comprehensible standard governing required data disclosures.

25   Although the term "high-level summary" is not expressly defined, the phrase has a

26   plain, commonsense meaning: an overview of a topic done in a more abstract and

27   general, rather than granular and detailed, manner.  Moreover, AB 2013 provides a

28   list of the specific information to include within this summary.  Similarly, the terms

1  "dataset" and "data point" have plain, commonsense meanings.[14]  In all, AB 2013

2  provides regulated developers fair warning regarding its requirements: to provide a

3  general description about the information sets used to train their generative AI

4  product that covers the specified list of information.

5      Contrary to xAI's assertions, a statute need not provide "perfect clarity and

6  precise guidance" to pass constitutional muster.  *Ward v. Rock Against Racism*, 491

7  U.S. 781, 794 (1989).  A statute passes muster so long as it regulates conduct

8  "according 'to an imprecise but comprehensible normative standard[.]'" *Botosan v.*

9  *Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) (quoting *Coates v. City of*

10  *Cincinnati*, 402 U.S. 611, 614 (1971)).  "[T]he Supreme Court and the Ninth

11  Circuit have recognized that '[m]any statutes will have some inherent vagueness'

12  and that a certain quantum of vagueness is permissible—and even necessary."

13  *Oregon Ass'n of Hosps. & Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1154 (D.

14  Or. 2024) (citing *Rose v. Locke*, 423 U.S. 48, 49-50 (1975)).  AB 2013 meets this

15  standard and is not unduly vague.

16  **III.  THE EQUITIES DO NOT FAVOR INJUNCTIVE RELIEF**

17      xAI has likewise failed to establish the other requirements for injunctive relief.

18  xAI's delay in seeking a preliminary injunction undercuts their assertion that they

19  face a risk of irreparable harm.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co*.,

20  762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a

21  preliminary injunction implies a lack of urgency and irreparable harm.").  AB 2013

22  was passed in September 2024, more than a year ago.  xAI provides no reason why

23  it could not have brought its challenge several months ago and permitted this Court

---

[14] *See, e.g., Data*, Merriam-Webster Dictionary Online,
https://www.merriam-webster.com/dictionary/data (defining "data" as "factual information" and "information in digital form that can be transmitted or received") (last accessed Feb. 2, 2026); *Dataset*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/dataset (defining "dataset" as "a collection of data taken from a single source or intended for a single project") (last accessed Feb. 2, 2026).

1  the opportunity to evaluate its claims on a less-rushed schedule and a more fulsome

2  record than here—particularly given that xAI has already made disclosures

3  pursuant to the statute.

4      Second, the balance of equities and public interest do not favor injunctive

5  relief.  Where, as here, the government is the opposing party, the last two factors of

6  the preliminary injunction analysis—the balance of equities and public interest—

7  merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  To

8  analyze these factors, the Court "'balance[s] the competing claims of injury'" and

9  "'consider[s] the effect of granting or withholding the requested relief,'" paying

10  "'particular regard for the public consequences in employing the extraordinary

11  remedy of injunction.'"  *Winter*, 555 U.S. at 24 (citations omitted).

12      A State "suffers a form of irreparable injury" when it is "enjoined . . . from

13  effectuating statutes enacted by representatives of its people."  *Maryland v. King*,

14  567 U.S. 1301, 1303 (2013) (internal quotation marks and citation omitted).  And

15  enjoining AB 2013 would further work harm by denying consumers the ability to

16  make informed choices about the generative AI models they use.  In contrast, any

17  burden on xAI from denying injunctive relief is minimal—particularly given that

18  xAI has already released disclosures under AB 2013.

19  **IV.  ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED**

20      Injunctive relief "must be tailored to remedy the specific harm alleged."

21  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotation

22  marks and citation omitted).  Should this Court grant a preliminary injunction (and

23  it should not), it should tailor such relief to reach only those parts of AB 2013 that

24  xAI has substantiated are 1) likely invalid under xAI's claims and that 2) will harm

25  xAI.  After all, xAI has already provided disclosures under AB 2013.  Thus, this

26  Court should confine any injunctive relief to solely preventing any further, specific,

27  unconstitutional disclosure required by AB 2013 rather than enjoining the statute as

28  a whole.

24

1    Such tailoring is particularly appropriate here given that the subcategories of

2 information that must be included in a report are severable.  Federal courts apply

3 California law when analyzing severability.  *See Vivid Ent., LLC v. Fielding*, 774

4 F.3d 566, 574 (9th Cir. 2014).  California courts apply a three-part test to determine

5 severability: the invalid part of the law "must be grammatically, functionally, and

6 volitionally separable."  *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th

7 231, 271 (2011) (citation omitted).  The provisions of AB 2013 that list specific

8 categories of information to include in a report meet the requirements for

9 severability.  Since each category of information is listed separately, the provisions

10 are clearly grammatically separable—any offending provision can simply be

11 excised, leaving the remainder grammatically intact.  Similarly, each of them are

12 functionally separable, as removing one subset of information does not impair the

13 functionality of the reporting requirement in general or the remaining categories of

14 information to be included.  Finally, the requirement for volitional separability is

15 met, since it is "eminently reasonable to suppose that those who favor the [Act]

16 would be happy to achieve at least some substantial portion of their purpose[.]"

17 *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 332 (1975).  Thus, if

18 this Court were to grant an injunction, it should tailor such relief to solely the

19 portions of the law that xAI establishes are likely unconstitutional and that will

20 affect xAI beyond the scope of the disclosures already made.

21 ///

22 ///

23 ///

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be denied.

Dated:  February 2, 2026                                    Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General


/s/ Joe Meeker
JOE MEEKER
Deputy Attorney General
*Attorneys for Defendant Attorney
General Rob Bonta*

26

1

**CERTIFICATE OF COMPLIANCE**

2         The undersigned, counsel of record for Defendant Attorney General Rob

3 Bonta, certifies that this brief comprises 25 pages, excluding the signature page,

4 which complies with the page limit set by the Standing Order of Judge Jesus G.

5 Bernal dated January 20, 2026.

6 Dated:  February 2, 2026                 Respectfully submitted,

7                                       ROB BONTA

8                                       Attorney General of California

9

10                                       /s/ Joe Meeker

                                      JOE MEEKER

11                                       Deputy Attorney General

                                      *Attorneys for Defendant Attorney*

12                                       *General Rob Bonta*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Case Name:    ***X.AI LLC v. Rob Bonta***

Case No.:      **2:25-cv-12295-JGB (SSCx)**

I hereby certify that on <u>February 2, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

> **DEFENDANT'S OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION**
>
> **DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF DEFENDANT'S OPPOSITION (with Exhibits 1-6)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>February 2, 2026</u>, at San Francisco, California.

|                          |                          |
|:------------------------:|:------------------------:|
| Vanessa Jordan           | *Vanessa Jordan*         |
| Declarant                | Signature                |