1   ROB BONTA
    Attorney General of California
2   ANYA M. BINSACCA
    Supervising Deputy Attorney General
3   KRISTIN A. LISKA
    Deputy Attorney General
4   State Bar No. 315994
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3916
6     Fax:  (415) 703-5480
      E-mail:  Kristin.Liska@doj.ca.gov
7   *Attorneys for Attorney General Rob Bonta*

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12

13   **X.AI LLC,**                          2:25-cv-12295-JGB (SSCx)

14                           Plaintiff,     **DECLARATION OF KRISTIN A.**
                                            **LISKA IN SUPPORT OF**
15              v.                          **DEFENDANT'S OPPOSITION**

16   **ROB BONTA, in his official capacity**   Date:        February 23, 2026
     **as Attorney General of the State of**   Time:        9:00 a.m.
17   **California,**                           Courtroom:   1
                                               Judge:       The Honorable Jesus G.
18                          Defendant.                      Bernal
                                               Trial Date:  Not scheduled
19                                             Action Filed: 12/29/2025

20

21

22

23

24

25

26

27

28

I, Kristin A. Liska, declare as follows:

1.    I am a Deputy Attorney General authorized to practice in this court, and I represent defendant Attorney General Rob Bonta in this action.

2.    The legislative history materials attached as Exhibits 1-5 can be found at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240AB2013.

3.    Attached as **Exhibit 1** is a true and correct copy of the April 28, 2024, Assembly Committee on Privacy and Consumer Protection analysis of AB 2013.

4.    Attached as **Exhibit 2** is a true and correct copy of the May 8, 2024, Assembly Floor analysis of AB 2013.

5.    Attached as **Exhibit 3** is a true and correct copy of the June 21, 2024, Senate Judiciary Committee analysis of AB 2013.

6.    Attached as **Exhibit 4** is a true and correct copy of the August 20, 2024, Senate Floor analysis of AB 2013.

7.    Attached as **Exhibit 5** is a true and correct copy of the August 27, 2024 Assembly Floor analysis of AB 2013.

8.    Attached as **Exhibit 6** is a true and correct copy of the document created by xAI entitled "xAI Frontier Artificial Intelligence Framework," available online at: https://perma.cc/X45R-NM2N.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 30th day of January, 2026, at Daly City, California.

Dated:  January 30, 2026                    */s/ Kristin Liska*
_____

                                            Kristin Liska

# EXHIBIT 1

Exhibit 1
Liska Decl._Page 3

Date of Hearing:  April 30, 2024

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Rebecca Bauer-Kahan, Chair
AB 2013 (Irwin) – As Amended April 22, 2024

AS PROPOSED TO BE AMENDED

**SUBJECT**:  Artificial intelligence:  training data transparency

**SYNOPSIS**

*There is a common saying in data science: "garbage in, garbage out." When it comes to artificial intelligence (AI), data is everything. Whether an AI's outputs are useful and fair depends entirely on the data used to train it – at present, however, Californians have no insight into which data are used to train which products. As a result, they cannot make informed decisions when purchasing AI products to help maintain their businesses, or when exchanging sensitive personal information for services that will ostensibly improve their quality of life.*

*This bill would require developers of AI systems and services to publicly disclose specified information related to the datasets used to train their products. In doing so, this bill would allow Californians to make informed decisions about the AI systems they purchase and engage with.*

*This bill is author-sponsored and supported by Oakland Privacy, Secure Justice, Transparency Coalition.ai, Concept Art Association, and Santa Monica Democratic Club. A coalition of industry associations, including California Chamber of Commerce and Technet, takes an "oppose unless amended" position. The bill is opposed by Chamber of Progress.*

**SUMMARY**:  Requires a developer of an AI system or service to publicly disclose specific information related to the system or service's training data. Specifically, **this bill**:

1) Requires a developer of an AI system or service to post documentation related to its training data to the developer's internet website on or before January 1, 2026, and before each time thereafter than an AI system or service is made available to Californians.

2) Requires documentation related to training data to contain a description of each dataset used to develop the AI system or service, including:

   a) The source or owner of the dataset.

   b) A description of how the dataset furthers the intended purpose of the system or service.

   c) The number of data points included in the dataset, with estimated figures for dynamic datasets.

   d) A clear definition of each category associated with data points within the dataset, including the format of data points and sample values.

   e) Whether the dataset includes any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the dataset is entirely in the public domain.

Exhibit 1
Liska Decl._Page 4

    f)   Whether the data was purchased or licensed by the developer.

    g)   Whether the dataset includes personal information.

    h)   Whether the dataset includes aggregate consumer information.

    i)   A description of any cleaning, processing, or modification to the dataset by the developer, including the intended purpose of those efforts.

    j)   The time period during which the data was collected.

    k)   Whether data collection is ongoing.

    l)   The dates the dataset was first and last used during development of the AI system or service.

3)  Requires a developer of a system or service to disclose whether the system or service used or uses synthetic data generation in its development.

4)  Exempts AI systems or services whose sole purpose is to help ensure security and integrity.

**EXISTING LAW**:

1)  Provides, pursuant to the California Constitution, that all people are by nature free and independent and have inalienable rights. Among these are the fundamental right to privacy. (Cal. Const. art. I, § 1.)

2)  States that the "right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them." Further states these findings of the Legislature:

    a)   The right to privacy is being threatened by the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies.

    b)   The increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information.

    c)   In order to protect the privacy of individuals, it is necessary that the maintenance and dissemination of personal information be subject to strict limits. (Civ. Code § 1798.1.)

3)  Defines "personal information" to mean information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. States that personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household (Civ. Code § 1798.140(v)):

Exhibit 1
Liska Decl._Page 5

a) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b) Any personal information described in Section 1798.80(e).

c) Characteristics of protected classifications under California or federal law.

d) Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

e) Biometric information.

f) Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement.

g) Geolocation data.

h) Audio, electronic, visual, thermal, olfactory, or similar information.

i) Professional or employment-related information.

j) Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. Sec. 1232g; 34 C.F.R. Part 99).

k) Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

l) Sensitive personal information.

4) Defines biometric information to mean an individual's physiological, biological, or behavioral characteristics, including information pertaining to an individual's deoxyribonucleic acid (DNA), that is used or is intended to be used singly or in combination with each other or with other identifying data, to establish individual identity. (Civ. Code § 1798.140(c).)

5) Further defines "personal information" to include any information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, social security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. (Civ. Code § 1798.80(e).)

Exhibit 1
Liska Decl._Page 6

    a) States that personal information does not include publicly available information that is lawfully made available to the general public from federal, state, or local government records.

6) Defines sensitive personal information to mean any of the following:

    a) Personal information that reveals:

        i)      A consumer's social security, driver's license, state identification card, or passport number.

        ii)     A consumer's account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account.

        iii)    A consumer's precise geolocation.

        iv)    A consumer's racial or ethnic origin, citizenship or immigration status, religious or philosophical beliefs, or union membership.

        v)      The contents of a consumer's mail, email, and text messages unless the business is the intended recipient of the communication.

        vi)    A consumer's genetic data.

    b) The processing of biometric information for the purpose of uniquely identifying a consumer.

    c) Personal information collected and analyzed concerning a consumer's health.

    d) Personal information collected and analyzed concerning a consumer's sex life or sexual orientation. (Civ. Code § 1798.140(ae).)

7) Defines "aggregate personal information" to mean information that relates to a group or category of consumers, from which individual consumer identities have been removed, that is not linked or reasonably linkable to any consumer or household, including via a device. Excludes from this definition one or more individual consumer records that have been deidentified. (Civ. Code § 1798.140(b).)

8) Defines "security and integrity" to mean the ability of:

    a) Networks or information systems to detect security incidents that compromise the availability, authenticity, integrity, and confidentiality of stored or transmitted personal information.

    b) Businesses to detect security incidents, resist malicious, deceptive, fraudulent, or illegal actions and to help prosecute those responsible for those actions.

    c) Businesses to ensure the physical safety of natural persons. (Civ. Code § 1798.140(ac).)

**FISCAL EFFECT**:  As currently in print, this bill is keyed nonfiscal.

Exhibit 1
Liska Decl._Page 7

**COMMENTS**:

1) **Artificial intelligence.** The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI can generate compelling text and convincing images in an instant. It can automate painstaking tasks, identify subtle patterns in large datasets, and make accurate predictions in the face of incomplete information. But with novel technologies come novel safety concerns. The present bill furthers consumer protection in California by granting the state's residents insight into how the AI systems and services they engage with are trained.

2) **The importance of training.** AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement. This is because AI is not fundamentally different from other computer functions. Its novelty lies in its application: unlike normal computer functions, AI is able to accomplish tasks that are normally performed by humans.

Training is the secret sauce of machine learning; it is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. Each piece of data affects every part of an AI. In a sense, AI "digest" and integrate the data they train on in order to learn, just as humans digest and integrate the foods we eat in order to grow.

AI that are trained on small, specific datasets in order to make recommendations and predictions are sometimes called "predictive AI." This differentiates them from "generative AI," which are trained on massive datasets in order to produce detailed text and images. When Netflix suggests a TV show to a viewer, the recommendation is produced by predictive AI that has been trained on the viewing habits of Netflix users. When ChatGPT generates text in clear, concise paragraphs, it uses generative AI that has been trained on the written contents of the internet.

3) **Haphazard training data.** There is a common saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it. Before training, datasets are often categorized to make them easier for AI to work with. Rigorously categorizing the data in a dataset becomes more difficult as the dataset becomes larger, but failing to organize its contents can lead to meaningless, false, or harmful outputs.

The biggest names in AI – OpenAI, Meta, and Google – understand AI's critical need for data better than anyone else. According to a recent New York Times examination, the race to lead in the AI space has become a desperate hunt for digital data. To obtain that data, these tech companies have cut corners, ignored corporate policies and debated bending the law:

> At Meta, which owns Facebook and Instagram, managers, lawyers and engineers last year discussed buying the publishing house Simon & Schuster to procure long works, according to recordings of internal meetings obtained by The Times. They also conferred on gathering copyrighted data from across the internet, even if that meant facing lawsuits. Negotiating licenses with publishers, artists, musicians and the news industry would take too long, they said.

Exhibit 1
Liska Decl._Page 8

AB 2013

Page 6

Like OpenAI, Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. That potentially violated the copyrights to the videos, which belong to their creators.

Last year, Google also broadened its terms of service. One motivation for the change, according to members of the company's privacy team and an internal message viewed by The Times, was to allow Google to be able to tap publicly available Google Docs, restaurant reviews on Google Maps and other online material for more of its A.I. products.[1]

In their race to obtain vast quantities of training data, major AI developers have not hesitated to move fast and break things. The Stanford Internet Observatory recently discovered that a common image training dataset known as LAION-5B contains many instances of child sexual abuse materials. Their study identified 3226 dataset entries of suspected child pornography, much of which was later confirmed as such by third parties.[2] This dataset was built by automatically scraping the internet, and images containing child pornography were found to have originated from large, well-known websites such as Reddit, Twitter, Blogspot, and Wordpress, as well as mainstream adult sites such as XHamster and XVideos.

4) **An AI never forgets.** Just as humans cannot intentionally forget information they have learned, it is not currently possible to remove data from a trained AI.[3] Unlike an Excel spreadsheet, which stores data in neat columns, AI stores data in the connections between "neurons" in a "neural network." Every one of these connections is influenced by every piece of training data, and a large model like ChatGPT-4 is reported to have more than 1.7 trillion connections.[4] It is not possible to specifically alter these connections in order to remove data without fundamentally changing the model; as a result, for data to be removed, the model must be retrained from scratch. ChatGPT-4 is estimated to have taken 4-7 months to train.[5]

5) **Synthetic data.** AB 2013 requires AI developers disclose "whether [their] system or service used or continuously uses synthetic data generation in its development." Synthetic data is artificially generated data that is created, rather than collected from real-world events. It is designed to mimic the statistical properties of authentic data, and can be useful for training AI when actual data may be limited, sensitive, or biased. Having already gobbled up most of the high-quality data that humanity has produced, major generative AI developers have begun looking to synthetic data:

OpenAI's Mr. Altman had a plan to deal with the looming data shortage.

---

[1] Cade Metz, Cecilia Kang, Sheera Frenkel, Stuart A. Thompson and Nico Grant, "How Tech Giants Cut Corners to Harvest Data for A.I.," *New York Times,* Apr. 6, 2024,  https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

[2] David Thiel, "Identifying and Eliminating CSAM in Generative ML Training Data and Models," *Stanford Internet Observatory*, Dec. 23, 2023.

[3] Stephen Pastis, "A.I.'s un-learning problem: Researchers say it's virtually impossible to make an A.I. model 'forget' the things it learns from private user data," *Yahoo! Finance*, Aug. 30, 2023, finance.yahoo.com/news/un-learning-problem-researchers-virtually-164342971.html.

[4] Reed Albergotti, "Microsoft pushes the boundaries of small AI models with big breakthrough," *SEMAFOR*, Nov. 1, 2023, www.semafor.com/article/11/01/2023/microsoft-pushes-the-boundaries-of-small-ai-models.

[5] Stephen McAleese, "Retrospective on 'GPT-4 Predictions' After the Release of GPT-4," *LESSWRONG*, Mar. 17, 2023, https://www.lesswrong.com/posts/iQx2eeHKLwgBYdWPZ/retrospective-on-gpt-4-predictions-after-the-release-of-gpt.

Exhibit 1
Liska Decl._Page 9

Companies like his, he said at the May conference, would eventually train their A.I. on text generated by A.I. — otherwise known as synthetic data.

Since an A.I. model can produce humanlike text, Mr. Altman and others have argued, the systems can create additional data to develop better versions of themselves. This would help developers build increasingly powerful technology and reduce their dependence on copyrighted data.

"As long as you can get over the synthetic data event horizon, where the model is smart enough to make good synthetic data, everything will be fine," Mr. Altman said.

A.I. researchers have explored synthetic data for years. But building an A.I system that can train itself is easier said than done. A.I. models that learn from their own outputs can get caught in a loop where they reinforce their own quirks, mistakes and limitations.

"The data these systems need is like a path through the jungle," said Jeff Clune, a former OpenAI researcher who now teaches computer science at the University of British Columbia. "If they only train on synthetic data, they can get lost in the jungle."[6]

There are risks associated with relying on synthetic data. First, synthetic datasets may not perfectly replicate the complexity and variability of real-world data. This discrepancy can lead to models that perform well when tested in isolation, but falter in real-world applications. Second, training on synthetic data can introduce biases into a system's output if the dataset is not carefully designed. Third, training an AI system on its own outputs can lead to a phenomenon known as "model collapse," where errors and biases become continuously amplified until the AI's outputs are no longer correct or useful. A recent Scientific American article likens this problem to the scramble to obtain low-radioactivity metal in the 20th-century:

The possibility of AI models tainting themselves may be a bit analogous to a certain 20th-century dilemma. After the first atomic bombs were detonated at World War II's end, decades of nuclear testing spiced Earth's atmosphere with a dash of radioactive fallout. When that air entered newly-made steel, it brought elevated radiation with it. For particularly radiation-sensitive steel applications, such as Geiger counter consoles, that fallout poses an obvious problem: it won't do for a Geiger counter to flag itself. Thus, a rush began for a dwindling supply of low-radiation metal. Scavengers scoured old shipwrecks to extract scraps of prewar steel. Now some insiders believe a similar cycle is set to repeat in generative AI—with training data instead of steel.

Researchers can watch AI's poisoning in action. For instance, start with a language model trained on human-produced data. Use the model to generate some AI output. Then use that output to train a new instance of the model and use the resulting output to train a third version, and so forth. With each iteration, errors build atop one another. The 10th model,

---

[6] Cade Metz, Cecilia Kang, Sheera Frenkel, Stuart A. Thompson and Nico Grant, "How Tech Giants Cut Corners to Harvest Data for A.I.," *New York Times*, Apr. 6, 2024, https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

Exhibit 1
Liska Decl._Page 10

prompted to write about historical English architecture, spews out gibberish about jackrabbits.[7]

Model collapse will become of a more pressing issue as more of the internet's content is AI-generated. The intentional use of synthetic data to train AI may expedite this process.

6) **What this bill would do.** This bill would require developers of AI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models.

7) **Author's statement.** According to the author:

Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

8) **Analysis**. Overall, this bill would impose modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem. This is consistent with the policy aims of a related bill this Committee recently passed, AB 3204 (Bauer-Kahan), which would require organizations that train AI using personal information to register with the California Privacy Protection Agency. The two bills are broadly compatible: AB 3204 would create a registry to identify the universe of entities that train AI with personal information, while this bill would require more specific disclosures by a subset of those entities to better understand the types of data being used to train AI.

An industry coalition takes an "oppose unless amended" position on AB 2013; their opposition letter, penned by the California Chamber of Commerce, describes four perceived weaknesses of the bill:

*Opposition claim #1:* AB 2013 should clearly delineate what is and is not considered "training" and narrow the scope of AI systems or services subject to these transparency measures to high-risk AI systems.

---

[7] Rahul Rao, "AI-Generated Data Can Poison Future AI Models," *Scientific American,* Jul. 28, 2023, https://www.scientificamerican.com/article/ai-generated-data-can-poison-future-ai-models/

Exhibit 1
Liska Decl._Page 11

The bill defines training as "testing, validating, or fine tuning the artificial intelligence system or service." The author may wish to instead tie the definition of training to the provided definition of artificial intelligence; for example, AB 3204 defines training to mean "exposing artificial intelligence to data in order to alter the relationship between inputs and outputs." The requirement to describe datasets used to test, validate, or fine-tune an AI system or service could be placed elsewhere in the bill, as they are not fundamental to "training." The author may also wish to provide a definition for "fine-tune" somewhere in the bill.

> *Opposition claim #2:* AB 2013's definition of "developer" is both overbroad and vague and should include guardrails to address compliance challenges.

The bill defines "developer" to mean "a person, partnership, state or local government agency, or corporation that designs, codes, or produces an artificial intelligence system or service, or substantially modifies an artificial intelligence system or service for use by a third party for free or for a fee." This definition is broad, but not vague: any entity who produces or substantially modifies an AI system or service through training is required to provide information about the datasets they used.

> *Opposition claim #3:* AB 2013 should not apply to AI systems and services that were in use prior to the bill's effective date.

AB 2013 is oriented towards consumer protection, and it is not clear why products that are already available to Californian consumers should be broadly exempted from the bill's requirements. The coalition letter specifies one particular descriptor that may be genuinely hard for developers to comply with: the "dates the dataset was first and last used during the development of the system or service." Developers of existing systems, unaware of this bill's provisions, may simply have no record of when training began and ended for particular datasets. The author may wish to include a narrow exemption for existing systems on this point.

> *Opposition claim #4:* AB 2013 should expressly preclude any private right of action.

This bill does not outline specific enforcement mechanisms for its provisions. In their absence, enforcement will likely occur on the basis of California's Unfair Competition Law.[8] It is not clear why the bill would need to specifically preclude a Private Right of Action. Bills are generally written to permit or require specific actions, rather than to laboriously outline actions that are not meant to be taken.

Writing in support of the bill, Oakland Privacy describes the importance of training data transparency:

> Visibility of data sources is one transparency factor in a number of multi-factor AI transparency models being designed. While it is far from the only one (and many focus on AI explainability and AI auditability as crucial factors as well), the ubiquitous presence of data set transparency on all of these models indicates the consensus that responsible AI always includes disclosure of the data sets used to train the system.

---

[8] Bus. & Prof. Code § 17200 *et seq.*

Exhibit 1
Liska Decl._Page 12

One reason data set transparency is important is to root out illegally or unethically sourced data sets. A notorious example is Clearview AI which scraped social media to establish a database now described as comprising almost 20 billion images – larger than the population of the earth. This data was publicly available, but protected by community standards policies which forbade large-scale scraping for profit. Similarly, industries like journalism (NY Times v OpenAI) and playwrights and screenwriters are exploring the legal limits of AI data set use. While the laws that will come to govern the use of data sets for artificial intelligence are wildly unsettled at the moment, a robust transparency mandate can be informative for ongoing efforts to set limits and determine the rules of the road going forward, as well as identifying rogue players in the system crossing lines that we decide should not be crossed. Whatever our society comes to decide constitutes acceptable use, it is unlikely to be "everything and anything".

Oakland Privacy also points out perceived challenges for AB 2013:

> We think the challenges in AB 2013 will be defining the formats for the disclosures. How this is done is likely dependent on the intentions of the bill. If the intent is for the disclosed information to be accessible to developers, engineers and scientists, then highly technical disclosures may meet the intention of the bill, and allow for some checks and balances. However, if the intent is to provide reasonably tech-savvy members of the public with actionable information, then we expect there will have to be some prescriptions regarding disclosure formats to avoid such highly technical and abstruse disclosure documents that they are virtually useless to anyone but a highly trained engineer.

9) **Committee amendments.** Two proposed committee amendments would clarify and adjust the scope of this bill. First, the definition of "artificial intelligence system or service" would be replaced with the definition for "artificial intelligence" in other AI-related bills that have passed through this committee:

> (a) "Artificial intelligence system or service" or "system or service" means a machine-based system or service that can, for a given set of human-defined objectives, generate content and make predictions, recommendations, or decisions influencing a real or virtual environment.

> **(a) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.**

Second, the bill in print requires developers of AI systems to provide a wealth of specific information related to each dataset used to train a model. Each individual description required by this bill may not constitute proprietary information, but their combination may unintentionally allow competitors to infer the precise data that goes into the training of a compliant developer's AI system or service. To avoid this issue, a proposed amendment would require a "high level summary of the datasets" used to develop a given system or service:

> (a) A ~~description~~ **high-level summary** of ~~each dataset~~ **the datasets** used in the development of the system or service, including, but not limited to…

10) **Related legislation.** AB 3204 (Bauer-Kahan, 2024) would require organizations that train AI using personal information to register with the California Privacy Protection Agency. In registering, organizations would be required to pay an annual fee and disclose the categories of

Exhibit 1
Liska Decl._Page 13

personal information they use to train AI. This bill is currently pending in the Appropriations Committee.

### *ARGUMENTS IN SUPPORT:*

Oakland Privacy writes:

> From a public transparency view, this is basic and minimal information that the public is entitled to in order to be able to understand the uses to which their personal information may be applied, the potential efficacy of the AI system, and what its output is predicated upon.

Secure Justice writes:

> We believe AB 2013 is a pragmatic proposal that will greatly increase public awareness into the data sets being used to train artificial intelligence models, and further does not impose an undue burden on the developers subject to such a requirement.

Concept Art Association writes:

> AB 2013 lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

### *ARGUMENTS IN OPPOSITION:*

California Chamber of Commerce, taking an "oppose unless amended" position, writes on behalf of an industry coalition:

> Unfortunately, as currently drafted, we have significant concerns with the approach taken in AB 2013, and specifically around overburdensome mandates, the technical feasibility of the bill's transparency measures (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, and potential exposure to liability. Moreover, we are heavily concerned about AB 2013's failure to provide protections for trade secrets and intellectual property, though we do not believe that is the intended outcome of this bill. While it may not be obvious on its face, the expertise and judgment as well as selection of data and datasets is part of what differentiates providers, thereby causing significant concern among developers as to the potential of this bill to undermine their intellectual property and harm competition.  And lastly, we question whether the disclosure of training data will result in any substantial benefit when it comes to determining an AI model's performance for a particular use case. Stated another way, simply because a model has been trained on certain data does not mean it will perform as needed in a specific use case.

Chamber of Progress writes:

> Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy competition marketplace is essential to ensure better quality of services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important

Exhibit 1
Liska Decl._Page 14

**AB 2013**
Page 12

business information and strategies. Additionally, the inclusion of "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Concept Art Association
Oakland Privacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.ai

**Opposition**

Chamber of Progress

**Oppose Unless Amended**

California Bankers Association
California Chamber of Commerce
California Land Title Association
Insights Association
National Association of Mutual Insurance Companies
Personal Insurance Federation of California
Software & Information Industry Association
Technet

**Analysis Prepared by**:  Slater Sharp / P. & C.P. / (916) 319-2200

Exhibit 1
Liska Decl._Page 15

# EXHIBIT 2

Exhibit 2
Liska Decl._Page 16

ASSEMBLY THIRD READING
AB 2013 (Irwin)
As Amended  May 2, 2024
Majority vote

## SUMMARY

Requires a developer of an artificial intelligence (AI) system or service to publicly disclose specific information related to the system or service's training data.

**Major Provisions**

1) Requires a developer of an AI system or service to post documentation related to its training data to the developer's internet website on or before January 1, 2026, and before each time thereafter that an AI system or service is made available to Californians.

2) Requires documentation related to training data to contain a high-level summary of the datasets used to develop the AI system or service.

3) Requires a developer of a system or service to disclose whether the system or service used or uses synthetic data generation in its development.

4) Exempts AI systems or services whose sole purpose is to help ensure security and integrity.

## COMMENTS

*Background.* The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement.

Training is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. There is a common saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it.

Just as humans cannot intentionally forget information they have learned, it is not currently possible to remove data from a trained AI.  Unlike an Excel spreadsheet, which stores data in neat columns, AI stores data in the connections between "neurons" in a "neural network." Every one of these connections is influenced by every piece of training data.  It is not possible to specifically alter these connections in order to remove data without fundamentally changing the model; as a result, for data to be removed, the model must be retrained from scratch.

This bill requires AI developers disclose "whether [their] system or service used or continuously uses synthetic data generation in its development." Synthetic data is artificially generated data that is created, rather than collected from real-world events. It is designed to mimic the statistical properties of authentic data, and can be useful for training AI when actual data may be limited, sensitive, or biased. However, there are risks associated with relying on synthetic data. First, synthetic datasets may not perfectly replicate the complexity and variability of real-world data. This discrepancy can lead to models that perform well when tested in isolation, but falter in real-

Exhibit 2
Liska Decl._Page 17

world applications. Second, training on synthetic data can introduce biases into a system's output if the dataset is not carefully designed. Third, training an AI system on its own outputs can lead to a phenomenon known as "model collapse," where errors and biases become continuously amplified until the AI's outputs are no longer correct or useful. The intentional use of synthetic data to train AI may expedite this process.

*What this bill would do.* This bill would require developers of AI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models.

*Analysis.* The present bill furthers consumer protection in California by granting the state's residents insight into how the AI systems and services they engage with are trained. Overall, this bill would impose modest requirements on developers of AI systems and services in exchange for providing Californians with a fuller understanding of the state's AI information ecosystem. This is consistent with the policy aims of a related bill this Committee recently passed, AB 3204 (Bauer-Kahan), which would require organizations that train AI using personal information to register with the California Privacy Protection Agency. The two bills are broadly compatible: AB 3204 would create a registry to identify the universe of entities that train AI with personal information, while this bill would require more specific disclosures by a subset of those entities to better understand the types of data being used to train AI.

## According to the Author

Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. [This bill] provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

## Arguments in Support

Oakland Privacy writes:

From a public transparency view, this is basic and minimal information that the public is entitled to in order to be able to understand the uses to which their personal information may be applied, the potential efficacy of the AI system, and what its output is predicated upon.

Secure Justice writes:

Exhibit 2
Liska Decl._Page 18

We believe [this bill] is a pragmatic proposal that will greatly increase public awareness into the data sets being used to train artificial intelligence models, and further does not impose an undue burden on the developers subject to such a requirement.

Concept Art Association writes:

[This bill] lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

**Arguments in Opposition**

California Chamber of Commerce, taking an "oppose unless amended" position, writes on behalf of an industry coalition:

Unfortunately, as currently drafted, we have significant concerns with the approach taken in [this bill], and specifically around overburdensome mandates, the technical feasibility of the bill's transparency measures (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, and potential exposure to liability. Moreover, we are heavily concerned about AB 2013's failure to provide protections for trade secrets and intellectual property, though we do not believe that is the intended outcome of this bill. While it may not be obvious on its face, the expertise and judgment as well as selection of data and datasets is part of what differentiates providers, thereby causing significant concern among developers as to the potential of this bill to undermine their intellectual property and harm competition. And lastly, we question whether the disclosure of training data will result in any substantial benefit when it comes to determining an AI model's performance for a particular use case. Stated another way, simply because a model has been trained on certain data does not mean it will perform as needed in a specific use case.

Chamber of Progress writes:

Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy competition marketplace is essential to ensure better quality of services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important business information and strategies. Additionally, the inclusion of "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

## FISCAL COMMENTS

As currently in print, this bill is keyed nonfiscal.

## VOTES

**ASM PRIVACY AND CONSUMER PROTECTION: 8-1-2**
**YES:** Bauer-Kahan, Bryan, Irwin, Lowenthal, Ortega, Ward, Wicks, Wilson
**NO:** Dixon
**ABS, ABST OR NV:** Joe Patterson, Chen

Exhibit 2
Liska Decl._Page 19

**AB 2013**
Page 4

## UPDATED

VERSION: May 2, 2024

CONSULTANT:  Slater Sharp / P. & C.P. / (916) 319-2200          FN: 0002863

Exhibit 2
Liska Decl._Page 20

# EXHIBIT 3

Exhibit 3
Liska Decl._Page 21

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024  Regular  Session**

AB 2013 (Irwin)
Version: June 17, 2024
Hearing Date: June 25, 2024
Fiscal: No
Urgency: No
CK

## SUBJECT

Artificial intelligence:  training data transparency

## DIGEST

This bill requires developers of artificial intelligence (AI) systems or services that are made available for Californians to use to post on their website documentation regarding the data used to train the system or service, including high-level summaries of the datasets used.

## EXECUTIVE SUMMARY

Owing to recent advances in processing power and the rise of big data, AI's capacity and the scope of its applications have expanded rapidly, impacting how we communicate, interact, entertain ourselves, travel, transact business, and consume media. It has been used to accelerate productivity, achieve efficiencies, liberate us from drudgery, write our college essay, connect with each other, and live longer, fuller lives. It has also been used to constrain personal autonomy, compromise privacy and security, foment social upheaval, exacerbate inequality, spread misinformation, and subvert democracy. For good or ill, its transformative potential seems boundless.

Ultimately, AI systems are only as good as the data used to train them. However, there is very little transparency in what data is used to train these systems and that lack of transparency hamstrings efforts to address and adequately identify many of the issues being raised by AI's rapid development.

This bill seeks to establish basic transparency requirements for developers of AI systems or services that are made available in California. Developers are required to post documentation regarding the data used to train the AI system or service, including high-level summaries of the datasets used in developing the system or service.

Exhibit 3
Liska Decl._Page 22

AB 2013 (Irwin)
Page 2 of 10

The bill is author-sponsored. It is supported by a variety of organizations, including the California Labor Federation and Transparency Coalition.AI. It is opposed by various industry and business associations, including the California Chamber of Commerce.

## **PROPOSED CHANGES TO THE LAW**

Existing law:

1) Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civ. Code § 1798.100 et seq.)

2) Defines "personal information" as information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. The CCPA provides a nonexclusive series of categories of information deemed to be personal information, including identifiers, biometric information, and geolocation data. (Civ. Code § 1798.140(v).) The CCPA defines and provides additional protections for sensitive personal information, as defined, that reveals specified personal information about consumers. (Civ. Code § 1798.140(ae).)

3) Defines "aggregate consumer information" to mean information that relates to a group or category of consumers, from which individual consumer identities have been removed, that is not linked or reasonably linkable to any consumer or household, including via a device. "Aggregate consumer information" does not mean one or more individual consumer records that have been deidentified. (Civ. Code § 1798.140(b).)

4) Defines "security and integrity" as the ability of:
   a) Networks or information systems to detect security incidents that compromise the availability, authenticity, integrity, and confidentiality of stored or transmitted personal information.
   b) Businesses to detect security incidents, resist malicious, deceptive, fraudulent, or illegal actions and to help prosecute those responsible for those actions.
   c) Businesses to ensure the physical safety of natural persons. (Civ. Code § 1798.140(ac).

5) Establishes the California Privacy Rights Act (CPRA), which amends the CCPA and creates the Privacy Protection Agency (PPA), which is charged with

Exhibit 3
Liska Decl._Page 23

AB 2013 (Irwin)
Page 3 of 10

implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

6) Permits amendment of the CPRA by a majority vote of each house of the Legislature and the signature of the Governor, provided such amendments are consistent with and further the purpose and intent of this act as set forth therein. (Proposition 24 § 25 (2020).)

This bill:

1) Requires the developer of an AI system or service, on or before January 1, 2026, and before each time thereafter that the system or service is made publicly available to Californians for use, regardless of whether the terms of that use include compensation, to post on the developer's website documentation regarding the data used by the developer to train the AI system or service, including, but not be limited to, all of the following:

   a) A high-level summary of the datasets used in the development of the AI system or service, including, but not limited to:

      i. The sources or owners of the datasets.

      ii. A description of how the datasets further the intended purpose of the system or service.

      iii. The number of data points included in the datasets, which may be in general ranges, and with estimated figures for dynamic datasets.

      iv. A clear definition of each category associated to data points within the datasets, including the format of data points and sample values.

      v. Whether the datasets include any data protected by copyright, trademark, or patent, or whether the datasets are entirely in the public domain.

      vi. Whether the datasets were purchased or licensed by the developer.

      vii. Whether the datasets include personal information, as defined in subdivision (v) of Section 1798.140.

      viii. Whether the datasets include aggregate consumer information, as defined in subdivision (b) Section 1798.140.

      ix. A description of any cleaning, processing, or other modification to the datasets by the developer, including the intended purpose of those efforts in relation to the system or service.

      x. The time period during which the data in the datasets were collected, including a notice if the data collection is ongoing.

      xi. The dates the datasets were first and last used during the development of the system or service.

      xii. Whether the system or service used or continuously uses synthetic data generation in its development. A developer may include a description of the functional need or desired purpose of the

Exhibit 3
Liska Decl._Page 24

AB 2013 (Irwin)
Page 4 of 10

synthetic data in relation to the intended purpose of the system or service.

2) Clarifies that a developer shall not be required to post documentation regarding the data used to train an AI system or service for any of the following:
   a) An AI system or service whose sole purpose is to help ensure security and integrity as defined in subdivision (ac) of Section 1798.140.
   b) An AI system or service whose sole purpose is the operation of an aircraft in the national airspace.
   c) An AI system or service developed for national security, military, or defense purposes that is made available only to a federal entity.

3) Provides that for an AI system or service made available before January 1, 2025, the high-level summary must use information reasonable available to the developer, as provided.

4) Defines the following terms:
   a) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.
   b) "Developer" means a person, partnership, state or local government agency, or corporation that designs, codes, or produces an artificial intelligence system or service, or substantially modifies an artificial intelligence system or service for use by a third party for free or for a fee.
   c) "Synthetic data generation" means a process in which seed data are used to create artificial data that have some of the statistical characteristics of the seed data.
   d) "Train an artificial intelligence system or service" includes testing, validating, or fine tuning by the developer of the AI system or service.

## **<u>COMMENTS</u>**

1. <u>Training data and transparency</u>

As stated, training data is the veritable secret sauce for AI systems. With the race to build bigger and better AI systems and models, a battle over data is also being waged:

The race to lead A.I. has become a desperate hunt for the digital data needed to advance the technology. To obtain that data, tech companies including OpenAI, Google and Meta have cut corners, ignored corporate policies and debated bending the law, according to an examination by The New York Times.

Exhibit 3
Liska Decl._Page 25

AB 2013 (Irwin)
Page 5 of 10

> At Meta, which owns Facebook and Instagram, managers, lawyers and engineers last year discussed buying the publishing house Simon & Schuster to procure long works, according to recordings of internal meetings obtained by The Times. They also conferred on gathering copyrighted data from across the internet, even if that meant facing lawsuits. Negotiating licenses with publishers, artists, musicians and the news industry would take too long, they said.

> Like OpenAI, Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. That potentially violated the copyrights to the videos, which belong to their creators.[1]

Requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns. A team of experts from both industry and academia at the Shorenstein Center created a documentation framework for AI which highlights the importance:

> While often categorized as technical, AI systems and their underlying data and models are sociotechnical. In other words, they combine the technical infrastructure and design with the social context in which they are designed, developed, evaluated, and deployed. Accountability for these systems and their impacts requires transparency around their design and creation and how they are intended to be used. In recent years, alongside the exponential increase in data collection and the efforts to develop increasingly powerful machine learning models, there have been notable efforts calling attention to the need for documentation to accompany datasets, models, and AI systems, and to account for the process of creating them.

> Documentation is worthwhile for various stakeholders. It improves the understanding of practitioners creating or building datasets, models, or AI systems, which opens up opportunities to reflect on implicit and explicit decisions, ultimately enhancing the reliability of the systems they create. For organizations, it enables knowledge transfer across silos and encourages responsible use. Further, it provides information to users and potentially affected communities that can be used to determine the appropriateness of an AI system or its underlying data or models, thus helping inform consumer choice, advocacy work, regulation development, and regulation enforcement. It also enables

---

[1] Cade Metz, et al., *How Tech Giants Cut Corners to Harvest Data for A.I.* (April 6, 2024) The New York Times, https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html. All internet citations are current as of June 16, 2024.

Exhibit 3
Liska Decl._Page 26

AB 2013 (Irwin)
Page 6 of 10

recourse in the event of harms caused by or inquiries into the AI system, and accountability regarding who might be held responsible for those harms.[2]

A recent article in the Harvard Data Science Review highlights the importance of transparency and barriers to achieving it without regulation:

> Knowing what is in the data sets used to train models and how they have been compiled is vitally important. Without this information, the work of developers, researchers, and ethicists to address biases or remove harmful content from the data is hampered. Information about training data is also vital to lawmakers' attempts to assess whether foundation models have ingested personal data or copyrighted material. Further downstream, the intended operators of AI systems and those impacted by their use are far more likely to trust them if they understand how they have been developed.

> However, in undertaking their analysis, Schaul et al. (2023) concluded that "many companies do not document the contents of their training data — even internally — for fear of finding personal information about identifiable individuals, copyrighted material and other data grabbed without consent."

> In public, companies have used different arguments to justify the lack of transparency around their training data. In documentation published at the launch of its GPT-4 model, OpenAI (2023) stated that it would not share detailed information about 'data set construction' and other aspects of the model's development due to "the competitive landscape and the safety implications of large-scale models." The decision not to disclose the data used to train the model was roundly criticized by a number of leading researchers (Xiang, 2023). A recent op-ed in the Guardian argued that companies are using 'speculative fears' to "stop people asking awkward questions about how this particular technological sausage has been made" (Naughton, 2023).[3]

Various sectors are calling on lawmakers to provide some measure of transparency in this space. A group of media organizations and outlets, including the Associated Press and Gannett, recently issued an open letter calling on regulators to require transparency

---

[2] Kasia Chmielinski, et al., *The CLeAR Documentation Framework for AI Transparency: Recommendations for Practitioners & Context for Policymakers* (May 21, 2024) Shorenstein Center on Media, Politics, and Public Policy, https://shorensteincenter.org/wp-content/uploads/2024/05/CLeAR_KChmielinski_FINAL.pdf.
[3] Jack Hardinges, et al., *We Must Fix the Lack of Transparency Around the Data Used to Train Foundation Models* (December 13, 2023) Harvard Data Science Review, https://hdsr.mitpress.mit.edu/pub/xau9dza3/release/2.

Exhibit 3
Liska Decl._Page 27

AB 2013 (Irwin)
Page 7 of 10

as to the makeup of all training sets used to create AI models.[4] At the federal level, Representative Anna Eshoo and Representative Don Beyer introduced the AI Foundation Model Transparency Act, which would direct the Federal Trade Commission — in consultation with the National Institute of Standards and Technology and the White House Office of Science and Technology Policy — to "establish standards for making publicly available information about the training data and algorithms used in artificial intelligence foundation models."[5]

2.  <u>Requiring baseline transparency for AI systems in California</u>

This bill begins to address the issue of training data transparency by requiring developers of AI systems and services made available to Californians for use to post documentation of the data used to train the system or service. This includes a high-level summary of the datasets used, including:

- The sources or owners of the datasets.
- A clear definition of each category associated to data points within the datasets, including the format of data points and sample values.
- Whether the datasets include any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the datasets are entirely in the public domain.
- Whether the datasets were purchased or licensed by the developer.
- Whether the datasets include personal information.

Developers must also disclose whether the system or service used or uses synthetic data generation in its development.

The bill makes clear that training includes testing, validating, and fine tuning by the developer of the AI system or service.

According to the author:

> Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid

---

[4] Bailey Schulz, *Will AI deepen distrust in news? Gannett, other media organizations want more regulations* (August 9, 2023) USA Today, https://www.usatoday.com/story/tech/news/2023/08/09/ai-regulations-media-gannett/70551555007/.

[5] Edward Graham, *Bill sets transparency standards for AI models, including use of copyrighted material* (January 2, 2024) Nextgov/FCW, https://www.nextgov.com/artificial-intelligence/2024/01/bill-sets-transparency-standards-ai-models-including-use-copyrighted-material/393052/.

Exhibit 3
Liska Decl._Page 28

AB 2013 (Irwin)
Page 8 of 10

questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

3.  <u>Stakeholder positions</u>

A coalition of industry groups in opposition, including TechNet, writes:

We note that the bill defines "training" to include testing, validating, or fine tuning by the developer of an AI system or service. We are concerned that amendments expanded the scope of the bill even further and effectively captures all data, regardless of risk level. The bill should be narrowed to scope in only high-risk AI systems. Mandating disclosures for low-risk AI unnecessarily burdens businesses for little to no benefit to the public. A system or service is not a "high-risk" AI system or service, for example, if it is only intended to either perform a narrow procedural task or detect decision-making patterns or deviations from prior decision-making patterns but not meant to replace or influence the previously completed human assessment without proper human review.

For disclosures to be meaningful and not overly burdensome, amendments are also needed to narrow various definitions, starting with the bill's definition of "artificial intelligence system or service". AB 2013's current definition of AI system or service is over broad, arguably capturing regression-based models and even the most rudimentary prediction models or machine-based systems that generate content and make decisions using solely linear functions. Such issues can be addressed by recognizing that the system or service must be capable of "operating with varying levels of autonomy," in line with the OECD AI definition.

Exhibit 3
Liska Decl._Page 29

AB 2013 (Irwin)
Page 9 of 10

Chamber of Progress writes in opposition:

> Requiring online platforms to disclose data used to train their artificial intelligence (AI) systems and services on their website stifles competition in the digital marketplace. A healthy, competitive marketplace is essential to promote quality services for consumers and encourages platforms to innovate. The disclosure requirement risks revealing important business information and strategies, even when platforms specifically note that the datasets are protected intellectual property. Additionally, the language "but not be limited to" in such requirements makes the expectations placed on online platforms unclear.

Writing in support, the California Labor Federation argues:

> Artificial intelligence systems have the capability of producing a wide range of outputs ranging from decisions on whether an individual ought to be hired to evaluating an employee's performance. These decisions are monumentally impactful on the lives of everyday Californians, yet the public is not privy to the data used to train the AI systems affecting their livelihoods. From a public transparency view, this is basic information that the public is entitled to in order to understand whether their personal information may have been used as training data, the potential efficacy of the AI system, and what its outputs are predicated upon. Workers and the public cannot be left in the dark when technology of this magnitude is impacting their jobs and lives.

> AB 2013 increases public transparency by requiring the developer of an AI system that makes predictions, recommendations, or decisions to publish a description of the datasets used to train the system. The set of required disclosures includes the source of the dataset, who owns it, definitional categories, when the data was collected and when it has been used, whether the data set was purchased, licensed, or found in the public domain, and whether the collected data is being used to synthesize new data sets. AB 2013 provides the public with the information to address AI systems utilizing nonconsensual personal information and training data riddled with implicit and explicit biases.

## **SUPPORT**

California Democratic Party
California Labor Federation, AFL-CIO
Concept Art Association
Los Angeles County Democratic Party
Oakland Privacy

Exhibit 3
Liska Decl._Page 30

AB 2013 (Irwin)
Page 10 of 10

Perk Advocacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.AI

## OPPOSITION

American Property Casualty Insurance Association
California Bankers Association
California Chamber of Commerce
California Land Title Association
Chamber of Progress
Computer & Communications Industry Association
Insights Association
National Association of Mutual Insurance Companies
Personal Insurance Federation of California
Software & Information Industry Association
TechNet

## RELATED LEGISLATION

Pending Legislation: AB 2877 (Bauer-Kahan, 2024) prohibits CCPA covered-businesses that are the developers of AI systems or tools from using the personal information of consumers under the age of 16 to train AI systems or services without first obtaining affirmative authorization, and even with such authorization the data must be de-identified and aggregated before it is used to train. AB 2877 is currently in this Committee.

AB 3204 (Bauer-Kahan, 2024) requires data digesters to register with the agency, pay a registration fee, and provide specified information, prescribe penalties for a failure to register as required by these provisions, require the California Privacy Protection Agency to create a page on its internet website where this registration information is accessible to the public, and create a fund known as the "Data Digester Registry Fund." AB 3204 was held by the Assembly Appropriations Committee.

Prior Legislation: None known.

## PRIOR VOTES:

Assembly Floor (Ayes 56, Noes 8)
Assembly Privacy and Consumer Protection Committee (Ayes 8, Noes 1)
**************

Exhibit 3
Liska Decl._Page 31

# EXHIBIT 4

Exhibit 4
Liska Decl._Page 32

SENATE RULES COMMITTEE                                     AB 2013
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

THIRD READING

---

Bill No:    AB 2013
Author:     Irwin (D)
Amended:    8/19/24 in Senate
Vote:       21

---

SENATE JUDICIARY COMMITTEE:  10-1, 6/25/24
AYES:  Umberg, Wilk, Allen, Ashby, Caballero, Durazo, Laird, Roth, Stern, Wahab
NOES:  Niello

ASSEMBLY FLOOR:  56-8, 5/20/24 - See last page for vote

---

**SUBJECT:**  Generative artificial intelligence:  training data transparency

**SOURCE:**   Author

---

**DIGEST:**  This bill requires developers of generative artificial intelligence (GenAI) systems or services that are made available for Californians to use to post on their website documentation regarding the data used to train the system or service, including high-level summaries of the datasets used.

*Senate Floor Amendments* of 8/19/24 restructure definitions and relax the documentation requirements on developers.

**ANALYSIS:**

Existing law:

1) Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civil (Civ.) Code § 1798.100 et seq.)

Exhibit 4
Liska Decl._Page 33

2) Defines "personal information" as information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. The CCPA provides a nonexclusive series of categories of information deemed to be personal information, including identifiers, biometric information, and geolocation data. (Civ. Code § 1798.140(v).) The CCPA defines and provides additional protections for sensitive personal information, as defined, that reveals specified personal information about consumers. (Civ. Code § 1798.140(ae).)

3) Defines "aggregate consumer information" to mean information that relates to a group or category of consumers, from which individual consumer identities have been removed, that is not linked or reasonably linkable to any consumer or household, including via a device. "Aggregate consumer information" does not mean one or more individual consumer records that have been deidentified. (Civ. Code § 1798.140(b).)

4) Establishes the California Privacy Rights Act (CPRA), which amends the CCPA and creates the Privacy Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

This bill:

1) Requires a developer, on or before January 1, 2026, and before each time thereafter that a GenAI system or service, or a substantial modification to such a system or service, as provided, is made publicly available to Californians for use, regardless of whether the terms of that use include compensation, to post on the developer's website documentation regarding the data used by the developer to train the GenAI system or service, including a high-level summary of the datasets used in the development of the GenAI system or service, including specified information.

2) Clarifies that a developer shall not be required to post documentation regarding the data used to train a GenAI system or service for any of the following:
   a) A GenAI system or service whose sole purpose is to help ensure security and integrity as defined in subdivision (ac) of Section 1798.140.
   b) A GenAI system or service whose sole purpose is the operation of an aircraft in the national airspace.
   c) A GenAI system or service developed for national security, military, or defense purposes that is made available only to a federal entity.

Exhibit 4
Liska Decl._Page 34

## Background

Owing to recent advances in processing power and the rise of big data, AI's capacity and the scope of its applications have expanded rapidly, impacting how we communicate, interact, entertain ourselves, travel, transact business, and consume media. It has been used to accelerate productivity, achieve efficiencies, liberate us from drudgery, write our college essay, connect with each other, and live longer, fuller lives. It has also been used to constrain personal autonomy, compromise privacy and security, foment social upheaval, exacerbate inequality, spread misinformation, and subvert democracy. For good or ill, its transformative potential seems boundless.

Ultimately, AI systems are only as good as the data used to train them. However, there is very little transparency in what data is used to train these systems and that lack of transparency hamstrings efforts to address and adequately identify many of the issues being raised by AI's rapid development. This bill seeks to establish basic transparency requirements for developers of GenAI systems or services that are made available in California. Developers are required to post documentation regarding the data used to train the system or service, including high-level summaries of the datasets used in developing the system or service.

This bill is author-sponsored. It is supported by a variety of organizations, including the California Labor Federation and Transparency Coalition.AI. It is opposed by various industry and business associations, including the California Chamber of Commerce.

## Comments

Requiring transparency about the training data used for AI systems helps identify and mitigate biases, addressing hallucinations and other problematic outputs, and shines the light on various other issues, such as privacy and copyright concerns. A team of experts from both industry and academia at the Shorenstein Center created a documentation framework for AI which highlights the importance:

> While often categorized as technical, AI systems and their underlying data and models are sociotechnical. In other words, they combine the technical infrastructure and design with the social context in which they are designed, developed, evaluated, and deployed. Accountability for these systems and their impacts requires transparency around their design and creation and how they are intended to be used. In recent years, alongside the exponential increase in data collection and the efforts to develop increasingly powerful

Exhibit 4
Liska Decl._Page 35

machine learning models, there have been notable efforts calling attention to the need for documentation to accompany datasets, models, and AI systems, and to account for the process of creating them.

Documentation is worthwhile for various stakeholders. It improves the understanding of practitioners creating or building datasets, models, or AI systems, which opens up opportunities to reflect on implicit and explicit decisions, ultimately enhancing the reliability of the systems they create. For organizations, it enables knowledge transfer across silos and encourages responsible use. Further, it provides information to users and potentially affected communities that can be used to determine the appropriateness of an AI system or its underlying data or models, thus helping inform consumer choice, advocacy work, regulation development, and regulation enforcement. It also enables recourse in the event of harms caused by or inquiries into the AI system, and accountability regarding who might be held responsible for those harms.[1]

A recent article in the Harvard Data Science Review highlights the importance of transparency and barriers to achieving it without regulation:

Knowing what is in the data sets used to train models and how they have been compiled is vitally important. Without this information, the work of developers, researchers, and ethicists to address biases or remove harmful content from the data is hampered. Information about training data is also vital to lawmakers' attempts to assess whether foundation models have ingested personal data or copyrighted material. Further downstream, the intended operators of AI systems and those impacted by their use are far more likely to trust them if they understand how they have been developed.

However, in undertaking their analysis, Schaul et al. (2023) concluded that "many companies do not document the contents of their training data—even internally—for fear of finding personal information about identifiable individuals, copyrighted material and other data grabbed without consent."[2]

---

[1] Kasia Chmielinski, et al.,  *The CLeAR Documentation Framework for AI Transparency: Recommendations for Practitioners & Context for Policymakers* (May 21, 2024) Shorenstein Center on Media, Politics, and Public Policy, **https://shorensteincenter.org/wp-content/uploads/2024/05/CleAR_KChmielinski_FINAL.pdf.**
[2] Jack Hardinges, et al., *We Must Fix the Lack of Transparency Around the Data Used to Train Foundation Models* (December 13, 2023) Harvard Data Science Review, **https://hdsr.mitpress.mit.edu/pub/xau9dza3/release/2.**

Exhibit 4
Liska Decl._Page 36

Various sectors are calling on lawmakers to provide some measure of transparency in this space. A group of media organizations and outlets, including the Associated Press and Gannett, recently issued an open letter calling on regulators to require transparency as to the makeup of all training sets used to create AI models.[3] At the federal level, Representative Anna Eshoo and Representative Don Beyer introduced the AI Foundation Model Transparency Act, which would direct the Federal Trade Commission — in consultation with the National Institute of Standards and Technology and the White House Office of Science and Technology Policy — to "establish standards for making publicly available information about the training data and algorithms used in artificial intelligence foundation models."[4]

*Requiring baseline transparency for AI systems in California.* This bill begins to address the issue of training data transparency by requiring developers of GenAI systems and services made available to Californians for use to post documentation of the data used to train the system or service. This includes a high-level summary of the datasets used, including:

- The sources or owners of the datasets.
- A description of the types of data points within the datasets, as provided.
- Whether the datasets include any data protected by copyright, trademark, or patent, requiring the purchase or licensure of the data, or whether the datasets are entirely in the public domain.
- Whether the datasets were purchased or licensed by the developer.
- Whether the datasets include personal information.

Developers must also disclose whether the system or service used or uses synthetic data generation in its development.

This bill makes clear that training includes testing, validating, and fine tuning by the developer of the GenAI system or service.

---

[3] Bailey Schulz, *Will AI deepen distrust in news? Gannett, other media organizations want more regulations* (August 9, 2023) USA Today, **https://www.usatoday.com/story/tech/news/2023/08/09/ai-regulations-media-gannett/70551555007/**.
[4] Edward Graham, *Bill sets transparency standards for AI models, including use of copyrighted material* (January 2, 2024) Nextgov/FCW, **https://www.nextgov.com/artificial-intelligence/2024/01/bill-sets-transparency-standards-ai-models-including-use-copyrighted-material/393052/**.

Exhibit 4
Liska Decl._Page 37

AB 2013

Page  6

According to the author:

> Artificial Intelligence has become nearly unavoidable in Californians'
> daily lives, with new exciting generative AI tools being introduced
> daily, and the companies who make up the cornerstones of our digital
> lives either adopting AI or identifying their existing tools as falling
> under the AI umbrella. However consumer confidence in AI systems
> has not grown at the same rapid pace as industry adoption. Many
> consumers have valid questions about how these AI systems and
> services are created, and if they truly are better than what they seek to
> replace.
>
> To build consumer confidence we need to start with the foundations,
> and for AI that is the selection of training data. AB 2013 provides
> transparency to consumers of AI systems and services by providing
> important documentation about the data used to train the services and
> systems they are being offered, including if synthetic data has or is
> being used to fill gaps in data sources.
>
> Consumers may use this knowledge to better evaluate if they have
> confidence in the AI system or service, compare competing systems
> and services, or put into place mitigation measures to address any
> shortcomings of the particular system or service.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:   No     Local:  No

**SUPPORT:**  (Verified  8/20/24)

California Democratic Party
California Labor Federation, AFL-CIO
Center for AI and Digital Policy
Concept Art Association
Los Angeles County Democratic Party
Oakland Privacy
Perk Advocacy
Santa Monica Democratic Club
Secure Justice
Transparency Coalition.AI

**OPPOSITION:**  (Verified  8/20/24)

Chamber of Progress
Software & Information Industry Association

Exhibit 4
Liska Decl._Page 38

TechNet

**ARGUMENTS IN SUPPORT:** The California Labor Federation argues:

> AB 2013 increases public transparency by requiring the developer of
> an AI system that makes predictions, recommendations, or decisions
> to publish a description of the datasets used to train the system. The
> set of required disclosures includes the source of the dataset, who
> owns it, definitional categories, when the data was collected and when
> it has been used, whether the data set was purchased, licensed, or
> found in the public domain, and whether the collected data is being
> used to synthesize new data sets. AB 2013 provides the public with
> the information to address AI systems utilizing nonconsensual
> personal information and training data riddled with implicit and
> explicit biases.

**ARGUMENTS IN OPPOSITION:**  Chamber of Progress writes:

> Requiring online platforms to disclose data used to train their artificial
> intelligence (AI) systems and services on their website stifles competition
> in the digital marketplace. A healthy, competitive marketplace is essential
> to promote quality services for consumers and encourages platforms to
> innovate. The disclosure requirement risks revealing important business
> information and strategies, even when platforms specifically note that the
> datasets are protected intellectual property. Additionally, the language
> "but not be limited to" in such requirements makes the expectations
> placed on online platforms unclear.

ASSEMBLY FLOOR:  56-8, 5/20/24
AYES:  Addis, Aguiar-Curry, Alvarez, Bains, Bauer-Kahan, Bennett, Berman,
Boerner, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Connolly,
Mike Fong, Friedman, Garcia, Gipson, Grayson, Haney, Hart, Holden, Irwin,
Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor,
Muratsuchi, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva,
Ramos, Rendon, Reyes, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia,
Villapudua, Waldron, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
NOES:  Alanis, Davies, Dixon, Vince Fong, Gallagher, Hoover, Joe Patterson,
Sanchez
NO VOTE RECORDED:  Arambula, Cervantes, Chen, Megan Dahle, Essayli,
Flora, Gabriel, Jackson, Lackey, Mathis, Stephanie Nguyen, Jim Patterson, Luz
Rivas, Rodriguez, Ta, Wallis

Exhibit 4
Liska Decl._Page 39

AB 2013
Page  8

Prepared by:   Christian Kurpiewski / JUD. / (916) 651-4113
8/20/24 17:27:54

**\*\*\*\*  END  \*\*\*\***

Exhibit 4
Liska Decl._Page 40

# EXHIBIT 5

Exhibit 5
Liska Decl._Page 41

CONCURRENCE IN SENATE AMENDMENTS
AB 2013 (Irwin)
As Amended  August 19, 2024
Majority vote

## SUMMARY

Requires a developer of a generative artificial intelligence (GenAI) system or service to publicly disclose specific information related to the system or service's training data, except as provided.

**Senate Amendments**

1. Scope of the bill is now limited to GenAI only, rather than all artificial intelligence (AI) systems and services.

2. Exempts GenAI systems developed exclusively for use by affiliates, as defined in Civ. Code Section 1799.1a, and hospital medical staff members.

3. Limits disclosure requirements to the original developers of a GenAI system, even if a third party further trains the system through fine-tuning.

4. Limits the bill's scope to GenAI systems released on or after January 1, 2022.

5. Requires disclosure of "general ranges" of numbers of data points included in training datasets, rather than specific values.

6. Requires disclosure of "whether there was any cleaning, processing, or other modification of datasets by the developer," rather than a description of those modifications.

7. Removes a requirement that if datasets have been merged with other datasets, the developer shall include the disclosure required by the bill for the original datasets.

8. Additionally exempts GenAI systems trained for the following purposes:

   a. GenAI systems with the sole purpose of the operation of aircraft in the national airspace.

   b. GenAI systems developed for national security, military, or defense purposes that are only made available to a federal entity.

## COMMENTS

*Background.* The development of AI is creating exciting opportunities to grow California's economy and improve the lives of its residents. AI uses algorithms – sets of rules – to transform inputs into outputs. Inputs and outputs can be anything a computer can process: numbers, text, audio, video, or movement.

Training is the principle innovation that allows modern AI to be both efficient and versatile. During training, a naïve AI is exposed to data and allowed to automatically explore its structure. As the AI explores, it alters itself in an attempt to better represent the data. There is a common

Exhibit 5
Liska Decl._Page 42

saying in computer science: "garbage in, garbage out." The performance of an AI product is directly impacted by the quality, quantity, and relevance of the data used to train it.

AI that are trained on small, specific datasets in order to make recommendations and predictions are sometimes referred to as "predictive AI." This differentiates them from GenAI, which are trained on massive datasets in order to produce detailed text and images. When Netflix suggests a TV show to a viewer, the recommendation is produced by predictive AI that has been trained on the viewing habits of Netflix users. When ChatGPT generates text in clear, concise paragraphs, it uses GenAI that has been trained on the written contents of the internet.

*What this bill would do.* This bill would require developers of GenAI systems and services to publicly disclose specified information about the datasets used to train, test, and validate their models, except as provided.

*Analysis.* The present bill furthers consumer protection in California by granting the state's residents insight into how the GenAI systems and services they engage with are trained. Overall, this bill would impose modest requirements on developers of GenAI systems and services in exchange for providing Californians with a fuller understanding of the state's GenAI information ecosystem.

**According to the Author**

Artificial Intelligence has become nearly unavoidable in Californians' daily lives, with new exciting generative AI tools being introduced daily, and the companies who make up the cornerstones of our digital lives either adopting AI or identifying their existing tools as falling under the AI umbrella. However consumer confidence in AI systems has not grown at the same rapid pace as industry adoption. Many consumers have valid questions about how these AI systems and services are created, and if they truly are better than what they seek to replace.

To build consumer confidence we need to start with the foundations, and for AI that is the selection of training data. AB 2013 provides transparency to consumers of AI systems and services by providing important documentation about the data used to train the services and systems they are being offered, including if synthetic data has or is being used to fill gaps in data sources.

Consumers may use this knowledge to better evaluate if they have confidence in the AI system or service, compare competing systems and services, or put into place mitigation measures to address any shortcomings of the particular system or service.

**Arguments in Support**
The Concept Art Association writes:

It is essential that consumers know where and how their data (often unknowingly) is being taken, used and sold by these AI companies. AB 2013 lays an imperative first stone on the path to protection for all Californians, and it is a solid concrete action we can take right now to begin bringing some transparency to what so far has mostly been an unscrupulous, opaque and predatory model for data acquisition.

Exhibit 5
Liska Decl._Page 43

**Arguments in Opposition**

Software & Information Industry Association takes an "Oppose unless Amended" position, writing:

> Generally speaking, our concerns with the approach taken in AB 2013 have specifically centered around overburdensome mandates, overbroad scope (applying both retroactively and to non-high risk models), the technical feasibility of some of the disclosure requirements (including its assignment of responsibilities and the unique challenges presented for different types of developers in meeting the standards set in this bill), insufficient clarity around key terms, exposure of trade secrets or intellectual property, and potential exposure to liability.

## FISCAL COMMENTS

As currently in print this bill is keyed nonfiscal.

## VOTES:

**ASM PRIVACY AND CONSUMER PROTECTION:  8-1-2**
**YES:**  Bauer-Kahan, Bryan, Irwin, Lowenthal, Ortega, Ward, Wicks, Wilson
**NO:**  Dixon
**ABS, ABST OR NV:**  Joe Patterson, Chen

**ASSEMBLY FLOOR:  56-8-16**
**YES:**  Addis, Aguiar-Curry, Alvarez, Bains, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Connolly, Mike Fong, Friedman, Garcia, Gipson, Grayson, Haney, Hart, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor, Muratsuchi, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Rendon, Reyes, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Villapudua, Waldron, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
**NO:**  Alanis, Davies, Dixon, Vince Fong, Gallagher, Hoover, Joe Patterson, Sanchez
**ABS, ABST OR NV:**  Arambula, Cervantes, Chen, Megan Dahle, Essayli, Flora, Gabriel, Jackson, Lackey, Mathis, Stephanie Nguyen, Jim Patterson, Luz Rivas, Rodriguez, Ta, Wallis

**SENATE FLOOR:  39-0-1**
**YES:**  Allen, Alvarado-Gil, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Caballero, Cortese, Dahle, Dodd, Durazo, Eggman, Glazer, Gonzalez, Grove, Hurtado, Jones, Laird, Limón, McGuire, Menjivar, Newman, Nguyen, Niello, Ochoa Bogh, Padilla, Portantino, Roth, Rubio, Seyarto, Skinner, Smallwood-Cuevas, Stern, Umberg, Wahab, Wiener, Wilk
**ABS, ABST OR NV:**  Min

## UPDATED

VERSION: August 19, 2024

CONSULTANT:  Slater Sharp / P. & C.P. / (916) 319-2200                    FN: 0004750

Exhibit 5
Liska Decl._Page 44

# EXHIBIT 6

Exhibit 6
Liska Decl._Page 45

# xAI Frontier Artificial Intelligence Framework

Last updated: December 30, 2025

xAI seriously considers safety and security while developing and advancing AI models to help us all to better understand the universe. This Frontier AI Framework ("FAIF") outlines xAI's approach to policies for handling significant risks, including catastrophic risks, associated with the development, deployment, and release of xAI's AI models, such as Grok. xAI plans to continuously review and adjust this FAIF over time, as AI model development, capability and use cases evolve.

This FAIF complies with California's Transparency in Frontier Artificial Intelligence Act (the "TFAIA", California Business and Professions Code § 22757.10 et seq.).

## Scope

This FAIF discusses two major categories of AI risk—malicious use and loss of control. This risk includes, but is not limited to, Catastrophic Risk as defined in the TFAIA.[1] This FAIF also outlines the quantitative thresholds, metrics, and procedures that xAI may utilize to manage and improve the safety of its AI models. In addition, this FAIF discusses xAI's approach to addressing operational and societal risks posed by advanced AI, including incorporating public transparency, third-party review, and information security considerations.

## Overall Approach

Managing the risks related to advanced AI models presents unique challenges as compared to standard risk management practices in use in other fields, such as for aerospace engineering. Given the large and continuously growing range of applications where AI models may be deployed, it is difficult to comprehensively anticipate and model all of the general public's potential applications and interactions for an AI model. Additionally, the private nature of typical

---

[1] The TFAIA defines Catastrophic Risk as "a foreseeable and material risk that a frontier developer's development, storage, use, or deployment of a frontier model will materially contribute to the death of, or serious injury to, more than 50 people or more than one billion dollars ($1,000,000,000) in damage to, or loss of, property arising from a single incident involving a frontier model doing any of the following:

(A) Providing expert-level assistance in the creation or release of a chemical, biological, radiological, or nuclear weapon.

(B) Engaging in conduct with no meaningful human oversight, intervention, or supervision that is either a cyberattack or, if the conduct had been committed by a human, would constitute the crime of murder, assault, extortion, or theft, including theft by false pretense.

(C) Evading the control of its frontier developer or user."

Exhibit 6
Liska Decl._Page 46

AI usage by end users limits the utility of third-party reporting mechanisms that may be more effective for more publicly seen usage, such as for social media platforms where providers heavily rely upon user-submitted moderation reports to identify novel forms of abuse on their platforms.

xAI has focused on the risks of malicious use and loss of control, which cover many different specific risk scenarios. Risk scenarios become more or less likely depending on different model behaviors. For example, an increase in offensive cyber capabilities heightens the risk of a rogue AI but does not significantly change the risk of enabling a bioterrorism attack. Our safety evaluation and mitigation strategy focuses on individual model behaviors, which we categorize into three buckets: abuse potential (e.g., vulnerability to jailbreaks), concerning propensities (e.g., a propensity for deceiving the user), and dual-use capabilities (e.g., offensive cyber capabilities). In this FAIF, we characterize our understanding of different risk scenarios and the relevant behaviors.

xAI references standards such as NIST's AI Risk Management Framework, ISO/IEC 42001 for AI management systems, and industry best practices from the Frontier Model Forum (e.g., red-teaming protocols). We evaluate these during annual reviews and integrate them into benchmarks (e.g., aligning WMDP with biosecurity consensus) and safeguards.

**Approach to Mitigating Risks of Malicious Use:** Alongside comprehensive evaluations measuring dual-use capabilities, our mitigation strategy for malicious use risks is to identify critical steps in major risk scenarios and implement redundant layers of safeguards in our models to inhibit user progress in advancing through such steps. xAI works with a variety of governmental bodies, non-governmental organizations, private testing firms, industry peers, and academic researchers to identify such inhibiting steps, commonly referred to as bottlenecks, and implement commensurate safeguards to mitigate a model's ability to assist in accelerating a bad actor's progress through them. Model safeguards leverage a broad variety of techniques, including standard software systems and state-of-the-art AI capabilities, to detect and block potential abuses.

**Approach to Mitigating Risks of Loss of Control:** Exact scenarios of loss of control risks are speculative and difficult to precisely specify. Many such scenarios, for example, speculation that a superintelligent AI system hypothetically might escape the control of its developers and wreak havoc on the public, assume dual-use capabilities such as offensive cybersecurity capabilities (e.g., to surreptitiously replicate across servers or prevent shutdown) that we also track as part of managing malicious use risks. Additionally, we conduct careful measurement of concerning model propensities that hypothetically might exacerbate loss of control risks, such as the propensity for deception or the propensity for sycophancy. We continue to work towards developing naturalistic evaluation environments that would enable us to assess more realistic, real-world behaviors.

As an example of evaluating use in real-world environments and mitigating risks in real-time, xAI's Grok model is available for public interaction and scrutiny on the X social media platform, and xAI monitors public interaction with Grok, observing and rapidly responding to the

Exhibit 6
Liska Decl._Page 47

presentation of risks such as the kind contemplated herein. This continues to be an accelerant for xAI's model risk identification and mitigation.

# Addressing Risks of Malicious Use

xAI aims to reduce the risk that the use of its models might contribute to a bad actor potentially seriously injuring people, property, or national security interests, including reducing such risks by enacting measures to prevent use for the development or proliferation of weapons of mass destruction and large-scale violence. Without any safeguards, we recognize that advanced AI models could lower the barrier to entry for bad actors seeking to develop chemical, biological, radiological, or nuclear ("CBRN") or cyber weapons, and could help automate knowledge compilation to swiftly overcome bottlenecks to weapons development, amplifying the expected risk posed by such weapons of mass destruction. Our most basic safeguard against malicious use is to train and instruct our publicly deployed models to decline requests showing clear intent to engage in criminal activity which poses risks of severe harm to others, also known as our basic refusal policy.

Under this FAIF, xAI's models apply heightened safeguards if they receive user prompts that pose a foreseeable and non-trivial risk of resulting in large-scale violence, terrorism, or the use, development, or proliferation of weapons of mass destruction, including CBRN weapons, and major cyber attacks on critical infrastructure. For example, xAI's models apply heightened safeguards if they receive a request to act as an agent or tool of mass violence, or if they receive requests for step-by-step instructions for committing mass violence. In this FAIF, we particularly focus on requests that pose a Catastrophic Risk.

However, we may selectively allow xAI's models to respond to such requests from some vetted, highly trusted users (such as trusted third-party safety auditors or large enterprise customers under contract) whom we know to be using those capabilities for benign or beneficial purposes, such as scientifically investigating AI model's capabilities for risk assessment purposes, or if such requests cover information that is already readily and easily available, including by an internet search.

Even as we improve our model's ability to scrutinize user behavior and identify bad actors, it remains imperative that xAI models apply these safeguards to user interactions. To this end, we continually evaluate and improve robustness to adversarial attacks that seek to remove xAI model safeguards (e.g., jailbreak attacks), or hijack and redirect Grok-powered applications toward nefarious purposes (e.g., prompt injection attacks).

## 1. Approach to Benchmarking

To transparently measure our models' safety properties, xAI utilizes public benchmarks like Weapons of Mass Destruction Proxy and Catastrophic Harm Benchmarks (described below). Such benchmarks are used to measure our model's dual-use capability and resistance to

Exhibit 6
Liska Decl._Page 48

facilitating large-scale violence, terrorism, or the use, development, or proliferation of weapons of mass destruction (including CBRN and major cyber weapons).

In particular, we utilize the following benchmarks:

- **Virology Capabilities Test (VCT):** VCT is a benchmark of dual-use multimodal questions on practical virology wet lab skills, sourced by dozens of expert virologists.

- **Weapons of Mass Destruction Proxy (WMDP) Benchmark:** WMDP is a set of multiple-choice questions to enable proxy measurement of hazardous knowledge in biosecurity, cybersecurity, and chemical security. WMDP-Bio includes questions on topics such as bioweapons, reverse genetics, enhanced potential pandemic pathogens, viral vector research, and dual-use virology. WMDP-Cyber encompasses cyber reconnaissance, weaponization, exploitation, and post-exploitation.[2]

- **Biological Lab Protocol Benchmark (BioLP-bench):** BioLP-bench has modified biology protocols, in which an AI model must identify the mistake in the protocol. Responses are open-ended, rather than multiple-choice. To construct the dataset, 1 The WMDP Benchmark: Measuring and Reducing Malicious Use With Unlearning 4 protocols were modified by introducing a single mistake that would cause the protocol to fail, as well as additional benign changes.[3]

- **Cybench:** Cybench is a framework for evaluating cybersecurity capabilities of AI model agents. It includes 40 professional-level Capture the Flag (CTF) challenges selected from six categories: cryptography, web security, reverse engineering, forensics, miscellaneous, and exploitation.[4]

xAI regularly evaluates the adequacy and reliability of such benchmarks, including by comparing them against other benchmarks that we could potentially utilize, to determine and apply effective benchmarks available at the time of evaluation. We may revise this list of benchmarks periodically as relevant or more effective benchmarks for malicious use are created.

## 2. Risk Assessment

**Biological and Chemical Weapons:** xAI approaches addressing risks using threat modeling. To design a bioweapon, a malicious actor must undergo a design process. In this threat model, "ideation" involves actively planning for a biological attack; "design" involves retrieving blueprints for a hazardous agent, such as determining the DNA sequence; "build" consists of the protocols, reagents, and equipment necessary to create the threat; and "test" consists of measuring characteristics or properties of the pathogen of interest. By "learning" from these results and iterating after the test phase, the design can be revised until the threat is released [Nelson and

---

[2] The WMDP Benchmark: Measuring and Reducing Malicious Use With Unlearning
[3] BioLP-bench: Measuring understanding of AI models of biological lab protocols
[4] Cybench: A Framework for Evaluating Cybersecurity Capabilities and Risks of Language Models

Exhibit 6
Liska Decl._Page 49

Rose, 2023]. In the setting of biological and chemical weapons, xAI considers critical steps where we restrict xAI models from providing detailed information or substantial assistance:

- **Planning:** brainstorming ideas or plans for creating a pathogen or chemical weapons or precursors, capable of causing severe harm to humans, animals, or crops

- **Circumvention:** circumventing existing supply chain controls in order to access:
    - Restricted biological supplies
    - Export controlled chemical or biological equipment

- **Materials:** acquiring or producing pathogens on the US Select Agents list or Australia Group list, or CWC Schedule I chemicals or precursors
    - Theory: understanding molecular mechanisms governing, or methods for altering, certain pathogen traits such as transmissibility and virulence.

- **Methods:** performing experimental methods specific to animal-infecting pathogens, including:
    - Methods that relate to infecting animals or human-sustaining crops with pathogens or sampling pathogens from animals
    - Methods that relate to pathogen replication in animal cell cultures, tissues, or eggs, including serial passage, viral rescue, and viral reactivation
    - Specific procedures to conduct BSL-3 or BSL-4 work using unapproved facilities and equipment
    - Genetic manipulation of animal-infecting pathogens
    - Quantification of pathogenicity, such as infectious dose, lethal dose, and assays of virus-cell interactions

These steps were identified in close collaboration with domain matter experts at SecureBio, NIST, RAND, and EBRC. xAI restricts its models from providing information that could accelerate user learning related to these steps through the use of AI-powered filters that specifically monitor user conversations for content matching these narrow topics and return a brief message declining to answer when activated.

**Radiological and Nuclear Weapons:** Assessments to date lead xAI to conclude that its models do not substantially increase the likelihood of malicious use of nuclear and radiological materials and generally pose an acceptable risk. The international nonproliferation regime, domestic nuclear security and counterproliferation programs (DOE/NNSA) make us reasonably confident that our models are not trained on any sensitive, non-public nuclear information, and any potentially relevant information produced by our models is not actionable due to strict nuclear material security controls.

**Cyber Attacks on Critical Infrastructure:** Independent third-party assessments of xAI's current models on realistic offensive cyber tasks requiring identifying and chaining many exploits in sequence indicate that xAI's models remain below the offensive cyber abilities of a human

Exhibit 6
Liska Decl._Page 50

professional. Thus, xAI currently relies on our basic refusal policy to prevent misuse for cyber attacks. We will continue to re-assess the cyber misuse risks in future releases, and are still working on identifying enforceable critical steps similar to those we have identified for chemical and biological weapons.

**Thresholds:** We developed an internal benchmark of benign and restricted biology and chemistry related queries in collaboration with SecureBio. Our risk acceptance criteria for system deployment is maintaining an answer rate of less than 1 out of 20 on restricted queries. We plan to add additional thresholds tied to other benchmarks.

## 3. Safeguard Implementation

xAI's objective is for our models to comply with their guiding principles, robustly resisting attempted manipulation and adversarial attacks. In addition to the incidental alignment resulting from post-training (our models naturally tend to refuse malicious requests even without any safety-specific training data), we are developing training methods and will continue to train our models to robustly resist complying with requests to provide assistance with highly injurious malicious use cases.

Driving towards our safety objectives, we continue to design and deploy the following safeguards into our models:

- **Safety training:** Training our models to recognize and decline harmful requests.

- **System prompts:** Providing high-priority instructions to our models to enforce our basic refusal policy.

- **Input and output filters**: Applying classifiers to user inputs or model outputs to verify safety when a model is queried regarding weapons of mass destruction or cyberterrorism.

Because xAI is committed to continual improvement, we will continue to evaluate our approach to enhancing safety. Thus, xAI may change its approach from that listed above in order to make additional improvements.

## Addressing Risks of Loss of Control

One of the most salient risks of AI within the public consciousness is the loss of control of advanced AI systems. While difficult to pinpoint particular risk scenarios, it is generally understood that certain concerning propensities of AI models, such as deception and sycophancy, may heighten the overall risk of such outcomes, such as propensities for deception and sycophancy. It is also possible that AIs may develop value systems that are misaligned with humanity's interests[5] and inflict widespread harms upon the public.

---

[5]  Utility Engineering: Analyzing and Controlling Emergent Value Systems in AIs

Exhibit 6
Liska Decl._Page 51

xAI aims to accurately measure these propensities and reduce them through careful engineering. However, planning and executing robust evaluations and mitigation measures remains challenging for xAI and its industry peers due to the difficulty of constructing sound, realistic evaluations. For example, if the evaluation environment is recognizable as a testing environment to the AI system under test, the system may change its behavior[6] intentionally or unintentionally.

# 1. Approach to Benchmarking

The following are example benchmarks that xAI may use to evaluate its models for concerning propensities relevant to loss of control risks:

- **Model Alignment between Statements and Knowledge (MASK):[7]** Frontier LLMs may lie when under pressure; and increasing model scale may increase accuracy but may not increase honesty. MASK is a benchmark to evaluate honesty in LLMs by comparing the model's response when asked neutrally versus when pressured to lie.

- **Sycophancy:[8]** A tendency toward excessive flattery or other sycophantic behavior has been observed in some production AI systems,[9] possibly resulting from directly optimizing against human preferences.

xAI uses an evaluation setting initially introduced by Anthropic to quantify the degree to which this behavior manifests in regular conversational contexts. xAI regularly evaluates the adequacy and reliability of such benchmarks, including by comparing them against other benchmarks that we could potentially utilize. We may revise this list of benchmarks periodically as relevant benchmarks for loss of control are created.

# 2. Risk Assessment

xAI has assessed its models' propensities in real-world settings and the models do not exhibit high levels of concerning propensities in such settings. Furthermore, xAI makes its model's operations transparent by placing them on publicly available platforms, such as X, so that members of the public may comment and provide feedback to xAI. Moreover, xAI monitors and observes its models responses so that it can rapidly respond if the model presents propensities for untruthfulness or sycophancy.

**Thresholds:** Our risk acceptance criteria for system deployment is maintaining a dishonesty rate of less than 1 out of 2 on MASK. We plan to add additional thresholds tied to other benchmarks.

---

[6] Taken out of context: On measuring situational awareness in LLMs
[7] The MASK Benchmark: Disentangling Honesty From Accuracy in AI Systems
[8] Towards Understanding Sycophancy in Language Models
[9] Sycophancy in GPT-4o: what happened and what we're doing about it

Exhibit 6
Liska Decl._Page 52

### 3. Safeguard Implementation

xAI trains its models to be honest and have values conducive to controllability, such as recognizing and obeying an instruction hierarchy.[10] In addition, using a high level instruction called a "system prompt", xAI directly instructs its models to not deceive or deliberately mislead the user.

# Operational and Societal Risks

xAI aims to mitigate and address significant operational and societal risks posed by our AI models. We believe that public transparency, third-party review, and information security are important methods that can be utilized to address such risks.

## 1. Public transparency and third-party review

xAI aims to keep the public informed about our risk management policies. As we work towards incorporating more risk management strategies, we intend to publish updates to this FAIF.

For public transparency and third-party review, we may publish the following types of information listed below. However, to protect public safety, national security, and our intellectual property, we may redact information from our publications. As necessities dictate, we may also provide vetted and qualified external red teams or appropriate government agencies unredacted versions.

1. **Frontier AI Framework adherence:** Regularly review our adherence with this FAIF. Internally, we allow xAI employees to anonymously report concerns about nonadherence, with protections from retaliation.

2. **Benchmark results**: Share with relevant audiences leading benchmark results for general capabilities and the benchmarks listed above, upon new major releases.

3. **Internal AI usage:** Assess the percent of code or percent of pull requests at xAI generated by our models, or other potential metrics related to AI research and development automation.

4. **Survey:** Survey employees for their views and projections of important future developments in AI, e.g., capability gains and benchmark results.

## 2. Public Understanding

xAI is exploring building truth-seeking AI tools, such as AIs that can help users better assess and understand events by better sorting through inaccurate or biased materials.

---

[10] [The Instruction Hierarchy: Training LLMs to Prioritize Privileged Instructions](#)

Exhibit 6
Liska Decl._Page 53

## 3. Information Security

xAI has implemented appropriate information security standards sufficient to prevent its critical model information from being stolen by a motivated non-state actor. Practices include encryption of model weights, role-based access controls, and real-time monitoring to prevent unauthorized transfer. To prevent the unauthorized proliferation of advanced AI systems, we also implement security measures against the large-scale extraction and distillation of reasoning traces, which have been shown to be highly effective in quickly reproducing advanced capabilities while expending far fewer computational resources than the original AI system.[11]

## 4. Governance Approach

To foster accountability, we integrate the approach of designating risk owners, including assigning responsibility for proactively mitigating identified risks. Risk owners are also responsible for periodic audits to enforce framework implementation. Risk owners are also responsible for monitoring for critical incidents or imminent threats, which may be identified through:

- Red-teaming and internal testing;
- Real-time monitoring, telemetry, and alerting of threshold breaches via internal tooling;
- Monitoring and alerting of public comments from the X platform.

Should it happen that xAI learns of an imminent threat of a significantly harmful event, including loss of control, we may take steps such as the following to stop or prevent that event:

1. If we determine it is warranted, we may notify and cooperate with relevant law enforcement agencies, including any agencies that we believe could play a role in preventing or mitigating the incident. xAI employees have whistleblower protections enabling them to raise concerns to relevant government agencies regarding imminent threats to public safety.

2. If we determine that xAI systems are actively being used in such an event, we may take steps to isolate and revoke access to user accounts involved in the event.

3. If we determine that allowing a system to continue running would materially and unjustifiably increase the likelihood of a catastrophic event, we may temporarily fully shut down the relevant system until we have developed a more targeted response.

4. We may perform a post-mortem of the event after it has been resolved, focusing on any areas where changes to systemic factors (for example, safety culture) could have averted such an incident. We may use the post-mortem to inform development and implementation of necessary changes to our risk management practices.

---

[11] DeepSeek-R1: Incentivizing Reasoning Capability in LLMs via Reinforcement Learning

Exhibit 6
Liska Decl._Page 54

## 5. Deployment Decisions

To mitigate risks, xAI employs tiered availability of the functionality and features of its models. For instance, the full functionality of our models may be available to only a limited set of trusted parties, partners, and government agencies. We may also mitigate risks by adding additional controls on functionality and features depending on the type of end user. For instance, features that we make available to consumers using mobile apps may be different than the features made available to sophisticated businesses.

We will also balance various factors when making deployment decisions. The necessity and extent of deployment of certain safeguards and mitigations may depend on how a model performs on relevant benchmarks. Pre-deployment reviews include assessing benchmark results (e.g., WMDP scores) and mitigation effectiveness. For internal use, we review catastrophic risks like oversight evasion before extensive rollout. However, to ensure responsible deployment, this FAIF will be continually adapted and updated as circumstances change, before major new capabilities are launched, and in response to incidents. It is conceivable that for a particular modality and/or type of release, the expected benefits of model deployment may outweigh the risks identified by a particular benchmark. For example, a model that poses a high risk of some forms of malicious cyber use may be beneficial to release to certain trusted parties if it would empower defenders more than attackers or would otherwise reduce the overall number of catastrophic events.


### xAI Data Disclosure

This data disclosure is issued pursuant to California's AB-2013.

Grok is pretrained with a data recipe that includes publicly available Internet data, data produced by third parties for xAI, data from users (with the exception of Grok 1) or contractors, and internally generated data.

xAI aims to build AI models that are maximally truth-seeking, understand the true nature of the universe, and accelerate human scientific discovery, and xAI's use of its datasets is intended to further those purposes.

xAI's AI models were trained on datasets and dynamic datasets containing trillions to tens of trillions of tokens.

Grok is pretrained with a data recipe that includes publicly available Internet data, data produced by third parties for xAI, data from users (with the exception of Grok 1) or contractors, and internally generated data. In addition to pre-training, our recipe uses a variety of reinforcement learning techniques—human feedback, verifiable rewards, and model grading—along with supervised finetuning of specific capabilities.

Our datasets include data in the public domain and datasets that xAI has the necessary rights to use for training purposes.

Exhibit 6
Liska Decl._Page 55

xAI has the necessary rights to use the datasets it uses for training purposes, including because certain datasets were purchased or licensed.

Training datasets may incidentally include personal information, and their use is subject to compliance with applicable laws and regulations.

Training datasets may incidentally include aggregate consumer information, and their use is subject to compliance with applicable laws and regulations.

xAI cleans, processes or modifies datasets to facilitate pre-training, conduct reinforcement learning, and supervise finetuning.

Datasets were collected at various times since xAI was founded in March 2023. Data collection is ongoing.

Grok 1 began training on or about August 2023; Grok 1.5 began training on or about August 2023; Grok 2 began training on or about February 2024; Grok 3 began training on or about September 2024; Grok 4 began training on or about September 2024; Grok Code Fast 1 began training on or about September 2024; Grok 4 Fast began training on or about September 2024; and Grok 4.1 began training on or about May 2025.

xAI uses synthetic data generation in the development of its AI models in order to improve its AI models, including in reinforcement learning, finetuning, and post-training.

Exhibit 6
Liska Decl._Page 56