UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 25-12295 JGB (SSCx) | Date | March 4, 2026 |
| Title | X.AI LLC v. Rob Bonta | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):    Attorney(s) Present for Defendant(s):

**Proceedings:**    Order: (1) DENYING Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 22) (IN CHAMBERS)

Before the Court is Plaintiff X.AI LLC's ("X.AI" or "Plaintiff") motion for a preliminary injunction. ("Motion," Dkt. No. 22.) After considering the papers filed in support of and in opposition to the Motion, along with the parties' statements at oral argument on February 23, 2026, and subsequent submissions, the Court **DENIES** the Motion.

## I.   BACKGROUND

On December 29, 2025, Plaintiff filed a complaint against Defendant Rob Bonta in his official capacity as Attorney General of the State of California ("Defendant" or "the Attorney General"). ("Complaint," Dkt. No. 1.) On January 16, 2026, Plaintiff filed this Motion. (Mot.) Defendant filed his opposition on February 2, 2026. ("Opposition," Dkt. No. 30.) Plaintiff replied on February 9, 2026. ("Reply," Dkt. No. 31.) The Court held oral argument on the Motion on February 23, 2026. At the hearing, the Court ordered Defendant to provide a supplemental filing, which was timely submitted on February 27, 2026. ("Defendant's Statement," Dkt. No. 33.) Plaintiff filed a response to Defendant's Statement on March 2, 2026. ("Plaintiff's Statement," Dkt. No. 34.)
//
//
//
//

## II.  FACTS

In September 2024, the Governor of California signed Assembly Bill 2013 ("A.B. 2013") into law. (Compl. ¶ 61.)  The bill, entitled "Artificial Intelligence Training Data Transparency" requires developers of "a generative artificial intelligence system or service" that is "publicly available to Californians for use" to "post on the developer's internet website documentation regarding the data used by the developer to train the generative artificial intelligence system or service." Cal. Civ. Code § 3111.  The documentation must include "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service" addressing, but not limited to, twelve enumerated topics. Id. at (a).  Those topics include:

(1) The sources or owners of the datasets.
(2) A description of how the datasets further the intended purpose of the artificial intelligence system or service.
(3) The number of data points included in the datasets, which may be in general ranges, and with estimated figures for dynamic datasets.
(4) A description of the types of data points within the datasets. . . .
(5) Whether the datasets include any data protected by copyright, trademark, or patent, or whether the datasets are entirely in the public domain.
(6) Whether the datasets were purchased or licensed by the developer.
(7) Whether the datasets include personal information . . . .
(8) Whether the datasets include aggregate consumer information . . . .
(9) Whether there was any cleaning, processing, or other modification to the datasets by the developer, including the intended purpose of those efforts in relation to the artificial intelligence system or service.
(10) The time period during which the data in the datasets were collected, including a notice if the data collection is ongoing.
(11) The dates the datasets were first used during the development of the artificial intelligence system or service.
(12) Whether the generative artificial intelligence system or service used or continuously uses synthetic data generation in its development. . . .

Id. at (a)(1)-(12).  The statute exempts three types of models from disclosures: (1) a generative artificial intelligence system or service whose sole purpose is to help ensure security and integrity; (2) a generative artificial intelligence system or service whose sole purpose is the operation of aircraft in the national airspace; and (3) a generative artificial intelligence system or service developed for national security, military, or defense purposes that is made available only to a federal entity. Id. at (b).

Plaintiff produces and develops artificial intelligence ("AI") models that it intends to share broadly with the public.  (Compl. ¶ 17.)  Plaintiff is a "developer" under the definition provided in Section 3111.  (Id.)  The Attorney General is generally charged with enforcing California's laws.  Cal. Const. Art. 5, § 13.

Plaintiff raises three objections to A.B. 2013: (1) that it violates the Takings Clause of the Fifth Amendment; (2) that it violates the First Amendment; and (3) that it is unconstitutionally vague. (See Compl.)

On December 30, 2025, Plaintiff published on its website a "high-level, limited disclosure that does not reveal its trade secrets." (Mot. at 9 fn. 1.) Despite this, Plaintiff is concerned that Defendant will enforce against it for failure to comply with A.B. 2013. Plaintiff alleges that several aspects of the datasets used to train AI models—including their contents, origins, size, and cleaning methods—are valuable and non-public. (See Compl. ¶¶ 28-29, 49-50.) Plaintiff alleges that "information about the datasets and processes AI developers use to train their AI models is a closely protected trade secret." (Id. ¶ 45.)

### III. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). "When the government is a party, these last two factors merge." Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees, attorneys, and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d).

Courts in the Ninth Circuit may consider the Winter factors on a sliding scale and grant an injunction where the plaintiff raises "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff" if "the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (noting that the latter two elements are "the other two elements of the Winter test").

### IV. DISCUSSION

**A.     Jurisdiction**

Defendant first contends that Plaintiff lacks standing to raise its claim. To establish Article III standing, (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

To satisfy Article III's standing requirements in the context of a pre-enforcement challenge, a plaintiff must show that it faces "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979). A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." Id. (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593) (1923)). "A plaintiff has a sufficient injury for a pre-enforcement challenge where they allege '[(1)] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [(2)] proscribed by a statute, and [(3)] there exists a credible threat of prosecution thereunder.'" Kumar v. Koester, 131 F.4th 746, 752 (9th Cir. 2025) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)).

Plaintiff has already engaged in some degree of compliance with A.B. 2013 with its December 30, 2025, disclosure. Thus, the question is whether Plaintiff's desire to go no further than what it has already disclosed constitutes conduct arguably inflected with a constitutional interest that is proscribed by statute and carries a credible threat of enforcement. Because Plaintiff alleges that further disclosure could harm arguable constitutional interests, that prong is satisfied. The second issue is whether such conduct is proscribed by statute. Plaintiff's decision to file this suit, despite its current disclosure, suggests that the limited nature of the disclosure is arguably proscribed by statute and that more disclosure is necessary. As such, the second prong is satisfied.

The final issue is whether there exists a credible threat of enforcement. Defendant has stated that "the Attorney General's Office cannot comment on whether or when the Attorney General intends to pursue specific enforcement actions." (Defendant's Statement at 1.) "In challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution." Matsumoto v. Labrador, 122 F.4th 787, 797 (9th Cir. 2024) (internal citations omitted) (emphasis in original). Defendant had plainly refused to disavow enforcement.

At this stage, the Court finds that Plaintiff has standing to bring this case.

**B.      Likelihood of Success on the Merits**

"Likelihood of success on the merits is a threshold inquiry and is the most important factor." Env't Prot. Info. Ctr. v. Carlson, 968 F.3d 985, 989 (9th Cir. 2020). The Court analyzes this factor with respect to each claim Plaintiff raises.

   **1. Takings Clause**

Plaintiff's first allegation is that A.B. 2013 violates the Takings Clause of the Fifth Amendment. The Takings Clause states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. While the Takings Clause is typically thought of in terms of real property, the Supreme Court has held that "data cognizable as a trade-

secret property right" under state law "is protected by the Taking Clause of the Fifth Amendment." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1004 (1984).

Before the Court can evaluate whether Plaintiff has likely allegedly a successful Takings Clause claim, the Court must determine the likelihood of Plaintiff proving that the sources, sizes, and cleaning methods of its datasets qualify as trade secrets. (Mot. at 10.) Under California law, "the test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret." Amgen Inc. v. California Corr. Health Care Servs., 47 Cal. App. 5th 716, 734 (Cal. Ct. App. 2020) (internal citations omitted); see also Cal. Civ. Code § 3426.1(d). Federal law defines a trade secret as information in which "the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Plaintiff offers a variety of general allegations about the importance of datasets in developing AI models and why they are kept secret. For example, Plaintiff alleges that "xAI and other AI developers dedicate substantial resources to identifying high-quality data to train their models." (Compl ¶ 4.) Further, "businesses like xAI make significant efforts to safeguard information about the datasets they have acquired." (Id. ¶ 5.) Plaintiff's Complaint trades in frequent abstraction and hypotheticals, rather than pleading specifics about Plaintiff's practices. (See, e.g., id. ¶ 26 ("Some AI companies acquire and utilize data that others do not."); ¶ 27 ("For example, an AI company may obtain data from sources of information that are public, but not obvious locations to look for data."); ¶ 48 ("For example, an AI developer seeking to produce an AI model capable of image generation may rely on datasets of photos from photo hosting sources such as Wikimedia Commons. But another AI company might think to use other sources of photos, such as Openverse or Public Domain Pictures, or instead license datasets containing a wide range of images from sources like Getty Images or Adobe Stock. If one company does not use a dataset used by another, its AI model may not be as well trained. If xAI were to reveal all the datasets that it uses, its competitors would immediately move to acquire those sources to ensure their models were equally as effective.")

When it comes to specificity, Plaintiff alleges that "[a]s part of its development process, xAI generally used the methodology outlined above." (Id. ¶ 37.) It offers that "xAI's engineers invested substantial amounts of time and energy in acquiring datasets from various sources across the Internet to develop and eventually train the AI models that it has produced." (Id. ¶ 38.) Plaintiff also alleges that "[t]he amount of data that xAI uses is also valuable precisely because it is unknown to others" and that "xAI's processes for cleaning, modifying, and refining the datasets it has obtained are economically valuable information too." (Id. ¶¶ 51-52.)

Of course, Plaintiff also acknowledges that "[m]any AI companies will have overlap in the datasets they use." (Id. ¶ 50.) The important thing, Plaintiff alleges, is that "it is the *differences* between the datasets each company uses that gives xAI a competitive edge. If competitors could

see the sources of all of xAI's datasets or even the size of its datasets, competitors could evaluate both what data xAI has and how much they lack." (Id.) The problem is that Plaintiff has not alleged that it actually uses datasets that are unique, that it has meaningfully larger or smaller datasets than competitors, or that it cleans its datasets in unique ways. Plaintiff's resort to generalizations and hypotheticals about the AI model development industry make it difficult for the Court to find that Plaintiff has carried the heavy burden of showing a likelihood of success in proving that trade secrets are at play here.

It is not lost on the Court the important role of datasets in AI training and development, and that, hypothetically, datasets and details about them could be trade secrets. But Plaintiff's approach to generalized, abstract pleading has inhibited a determination in their favor at this stage. The Ninth Circuit has been clear in trade secret misappropriation cases that "a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993). Going further, the Ninth Circuit has also held that a plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 658 (9th Cir. 2020) (internal citation omitted). Plaintiff has made general arguments about datasets, dataset sizes, cleaning methods, and configurations of data, but has not identified any dataset or approach to cleaning and using datasets that is distinct from its competitors in a manner warranting trade secret protection.

Plaintiff has failed at this stage to sufficiently allege that trade secrets are implicated. As such, the Court finds that, as a threshold matter, Plaintiff is not likely to succeed on the merits of its Takings Clause claim based on the Complaint as pled.

**2. First Amendment**

Plaintiff's second allegation is that A.B. 2013 violates the First Amendment by compelling Plaintiff's speech based on content and viewpoint. (Mot. at 18.) Specifically, Plaintiff alleges that A.B. 2013 is content-based because it requires Plaintiff to disclose specific content about its AI models, and it is viewpoint-based because it exempts developers of AI models related to network security, aircraft operations, and national security from its requirements. (Id. at 18-19, 20.) Because of this, Plaintiff alleges that A.B. 2013 should be subject to strict scrutiny, which it fails. (Id.) Defendant responds that A.B. 2013 is a regulation of commercial speech that complies with the First Amendment. (Opp'n at 16.)

As an initial matter, while "[t]here is certainly some difference between compelled speech and compelled silence, . . . in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 796–97 (1988). Just because a statute requires speech rather than prohibiting it does not place it beyond the First Amendment's ambit.

Similarly, compelled statements of fact burden protected speech just as do compelled statements of opinion. Id. at 797-98.

While content-based and viewpoint-based laws are subject to higher scrutiny, laws regulating commercial speech are generally subject to lesser scrutiny. If a law is deemed to address commercial speech, it is generally subject to intermediate scrutiny. Id.

### a. Content-Based Discrimination

It is generally the case that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795 (1988). That said, Plaintiff's primary analogies between this case and existing caselaw are plainly distinguishable. In National Institute of Family and Life Advocates v. Becerra, the Court held that a "licensed notice" was content-based relation of speech where that notice required that "clinics must provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." 585 U.S. 755, 766 (2018) (hereinafter, "NIFLA"). The script, which dictated precisely what the plaintiff in that case was required to say, addressed abortion access, the very issue the plaintiff's mission it was to oppose. Here, there is no government-drafted script, nor is it Plaintiff's central mission to oppose public disclosure of AI model training datasets. These cases are not meaningfully similar.

Similarly, in Riley, a statute required professional fundraisers to "disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." 487 U.S. at 795. The state sought to impose in every instance of solicitation a preliminary disclosure that would not otherwise have been part of a fundraising pitch. A.B. 2013 does not require Plaintiff to disclose its training datasets in every interaction with a consumer, thereby constantly undermining the purpose of the interaction. And in Riley, there existed related statutes that required professional fundraisers to disclose that they were professional fundraisers and to provide the percentage information to those they were soliciting upon request. Plaintiff does not appear to argue that, were A.B. 2013's disclosures only available on request, that they would be acceptable. This is not a case about the manner of disclosure in specific interactions. Yet the alternative disclosure element of the fundraising state law was not challenged in Riley, so the case has nothing to say on the propriety of such a component—and the Court's discussion raised no issue with that provision.

Finally, in X Corp. v. Bonta, a state law "compel[led] every covered social media company to reveal its policy opinion about contentious issues, such as what constitutes hate speech or misinformation and whether to moderate such expression." X Corp. v. Bonta, 116 F.4th 888, 899 (9th Cir. 2024). That case involved a requirement that social medica companies reveal their opinions on various controversial topics. While of course required factual disclosures can be covered by the First Amendment just as well as opinion disclosures, Plaintiff has failed to over an on-point statutory analogy to this case, where disclosure of facts does not proceed according to a script in direct conflict with Plaintiff's central mission; does not require a

conversation-by-conversation disclosure where other forms of disclosure are available; and does not involve mandatory disclosure of controversial opinions.

But that does not entirely settle the issue. Pharm. Rsch. & Manufacturers of Am. v. Stolfi grappled with the issue of how to consider disclosure requirements like A.B. 2013. 153 F.4th 795 (9th Cir. 2025). The case divided disclosure requirements into two categories: (1) governmental reporting requirements, which may involve sharing of such reported information with the public; and (2) direct disclosure requirements, which require a private entity to communicate information directly to another private entity or the general public. See 153 F.4th at 809–10. This case appears to fit squarely within the second category, direct disclosure requirements, which is generally entitled to strict scrutiny. The Ninth Circuit instructs that in such circumstances, "the *only* exception is for reports that qualify as 'commercial speech' entitled to less constitutional protection. Id. at 811. The Court remains skeptical that these disclosures fit cleanly into a compelled speech category defined by cases like NIFLA, Riley, and X Corp., but Stolfi appears to obligate the view that A.B. 2013 is a content-based speech regulation entitled to strict scrutiny unless it qualifies as commercial speech.

Because the Court finds that A.B. 2013 likely constitutes a content-based speech regulation, the Court must consider whether it is in fact commercial speech. It need not address Plaintiff's allegations of viewpoint discrimination.[1]

### b. Commercial Speech

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" Id. at 900 (9th Cir. 2024) (quoting United States v. United Foods, Inc., 533 U.S. 405, 409 (2001). But that is not the whole of it. As the Supreme Court outlined in Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983), "[w]here the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." X Corp., 116 F.4th at 900 (internal citations omitted). "These so-called *Bolger* factors are important guideposts, but they are not necessarily dispositive." Id.

That acknowledgement is especially important here, where the Court does not address a statute regulating advertisements, but rather disclosure independent of advertisement for a product. As the Court in Stolfi recognized, the Bolger test and approaches to commercial speech in general arose in the context of advertisements. But that does not mean commercial speech

---

[1] Plaintiff alleges that, even if the Court finds that A.B. 2013 is a commercial speech regulation, strict scrutiny still applies because the statute engages in viewpoint discrimination, which triggers strict scrutiny even in commercial speech cases. (Reply at 8.) The Court is not persuaded based on the caselaw offered by Plaintiff at this stage that such a distinction is relevant or controlling here, even if the Court were to find that A.B. 2013 engages in viewpoint discrimination.

must relate to advertising to receive lesser scrutiny. The Stolfi Court, discussing governmental reporting requirements, noted that "[i]t would be odd to subject speech in a consumer-facing advertisement to *less* scrutiny than speech in an annual report filed with a state regulatory body simply because it better fits the doctrinal tests for defining commercial speech." Id. at 816. This implies that the scenario here, where the disclosure is public facing but not included with an advertisement or product label, is not excluded from being considered commercial speech just because the Bolger test is written in language tailored to advertisements.

In Stolfi, the Court found that the government reporting requirement—which included disclosures to the public—regulated commercial speech. The Court distinguished cases like X Corp. and NetChoice, LCC v. Bonta, 113 F.4th 1101 (9th Cir. 2024), because those cases "compel the covered entities to make subjective political or ideological statements" and the statute at issue in Stolfi did not. Id. at 819. The same is true here. The statute requires a high-level summary of datasets and descriptions of information related to those datasets. See A.B. 2013. The statute does not functionally ask Plaintiff to share its opinions on the role of certain datasets in AI model development or make ideological statements about the utility of various datasets or cleaning methods.

The Ninth Circuit has permitted "compelled disclosures" even in cases that "did not 'propose a commercial transaction,'" where the statutes "nonetheless provided parties to 'actual or potential' commercial transactions with information about those transactions." Id. at 821. That is precisely what A.B. 2013 does. In the marketplace of AI models, A.B. 2013 requires AI model developers to provide information about training datasets, thereby giving the public information necessary to determine whether they will use—or rely on information produced by—Plaintiff's model relative to the other options on the market. (See, e.g., Hearing on A.B. 2013 Before the Assembly Comm. on Privacy and Consumer Protection, (Cal. April 30, 2024) ("This bill would require developers of AI systems and services to publicly disclose specified information related to the datasets used to train their products. In doing so, this bill would allow Californians to make informed decisions about the AI systems they purchase and engage with.") After all, "[p]art of the reason that the First Amendment protects commercial speech is that such speech furthers the consumer's interest in the free flow of commercial information." Stolfi, 153 F.4th 795, 821 (internal quotations omitted); see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 561–62 (1980) (hereinafter "Central Hudson") ("Commercial expression . . . assists consumers and furthers the societal interest in the fullest possible dissemination of information.")

Plaintiff complains that A.B. 2013 "forces developers to publicly disclose their data sources in an attempt to identify what California deems to be 'data riddled with implicit and explicit biases.'" (Mot. at 20 (citing Cal. S. Rules Comm., A.B.2013, Senate Floor Analysis 3 (Aug. 20, 2024)).) That language comes from the California Labor Federation's arguments in support of the statute, not any legislator's statements or any language in the adopted bill itself. Plaintiff also asserts that A.B. 2013 "indirectly attempts to influence the viewpoints espoused by xAI's models (i.e., their outputs) by targeting the data that goes into them." (Mot. at 20.) But nothing in the language of the statute suggests that California is attempting to influence

Plaintiff's models' outputs by requiring dataset disclosure, rather than simply providing consumers with the information necessary to make judgments about Plaintiff's—and all other AI model developers'—model quality based on the data that goes into them.  There is nothing political, for example, about a consumer wanting to know if certain medical data or scientific information was used to train a model so that the consumer can evaluate whether the model is likely to be sufficiently comprehensively trained and reliable for the consumer's purposes.  Certainly some may use these disclosures to select or avoid certain models based on perceived political biases in training datasets, but that is only one of many potential metrics for consumer evaluation—and one that consumers in the AI model marketplace are entitled to consider when choosing their model.  No part of the statute indicates any plan to regulate or censor models based on the datasets with which they are developed and trained.  In Stolfi, the Court similarly held that "although drug pricing decisions may implicate controversial public policy issues, this fact is insufficient to transform the required reports into noncommercial speech."  153 F.4th at 824.

As such, the Court finds that A.B. 2013 likely implicates commercial speech.

### c. Intermediate Scrutiny

Given that the Court has found that Plaintiff has failed to carry its burden to show likelihood of success on the merits of its claim that A.B. 2013 regulates non-commercial speech, the Court considers the level of scrutiny appropriate.  Plaintiff contends that Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985), provides the appropriate standard, but Central Hudson would appear to be more on-point given existing caselaw.  While the Court might be inclined to find that A.B. 2013 regulates speech that is purely factual, noncontroversial, and not unjustified or unduly burdensome—the Zauderer standard—the Supreme Court's limited use of Zauderer outside of misleading advertisement regulations counsels against its application in this case.  In Milavetz, Gallop & Milavetz, P.A. v. U.S., the Court noted that it had previously employed Central Hudson in a case involving advertising statements that were not inherently misleading and not likely to mislead consumers.  559 U.S. 229, 250 (2010) (citing In re R.M. J., 455 U.S. 191 (1982)).  This case is even further afield from the original context under which Zauderer arose, tipping the scale toward Central Hudson.

For A.B. 2013 to "survive intermediate scrutiny under *Central Hudson*, the State must establish that the law directly advance[s] a substantial governmental interest, and [that] the means chosen [are] not . . . more extensive than necessary." Stolfi, 153 F.4th at 826 (internal quotations omitted).  Plaintiff's allegation that "it is far from clear how the trade secrets A.B.2013 would force xAI to disclose are of any value to consumers at all" is not especially compelling.  (Mot. at 21.)  It strains credulity to essentially suggest that no consumer is capable of making a useful evaluation of Plaintiff's AI models by reviewing information about the datasets used to train them and that therefore there is no substantial government interest advanced by this disclosure statute.
//
//

At the same time, it may be possible through the litigation process to demonstrate the limited utility of high-level dataset summaries for important consumer decisionmaking or that the state's approach with A.B. 2013 is "more extensive than necessary" to achieve the goal of transparency for consumers. While "'consumer curiosity' alone is generally insufficient as a substantial state interest," litigation may reveal that "the States asserted interests here are not limited to transparency for its own sake." Stolfi, 153 F.4th at 826 (internal citations omitted). It simply remains to be seen.

Ultimately, Plaintiff has demonstrated a distinct *possibility* of prevailing on the merits under Central Hudson. But it had not demonstrated a *likelihood* of success on the merits. The information before the Court is insufficient to come to such a conclusion at this stage. Plaintiff therefore does not satisfy this threshold inquiry for a preliminary injunction on its First Amendment claim.

### 3. Vagueness

Finally, the Court considers Plaintiff's vagueness challenge. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). Of course, the degree of clarity necessary to pass constitutional muster varies depending on the potential consequences of a violation, namely whether criminal or civil penalties are contemplated. See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498–99 (1982) ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Thus, "[i]n reviewing a business regulation for facial vagueness, . . . the principal inquiry is whether the law affords fair warning of what is proscribed." Id. at 503.

The statute requires AI model developers like Plaintiff to publish "[a] high-level summary of the datasets used in the development of the generative artificial intelligence system or service." Cal. Civ. Code § 3111. The "high-level summary" must include, but is not limited to, disclosures on a variety of topics touching sources and owners of datasets; the size of datasets; the period of collection of the data within the datasets; and other information. Id. Even if the term "high-level summary" is not the picture of clarity standing alone, it is followed by a precise list of information to be included. Plaintiff takes issue with "dataset" and "data point" being undefined in the statute, yet Plaintiff seems to understand and use with ease "dataset" throughout its Complaint. (See, e.g., Compl. ¶ 3.) Plaintiff questions the meaning of "dataset" and "data point" in its Complaint and offers various interpretations, but has not actually alleged that this term is ambiguous by industry standards—especially given that Plaintiff appears to know what "dataset" refers to in other parts of its Complaint. (Compl. ¶ 121.)

Plaintiff also takes issue with the statute's list of information being non-comprehensive, because there is apparently "no way of knowing what additional information must be provided to fully comply with that obligation." (Compl. ¶ 122.) But the Ninth Circuit has been clear that "criteria are [not] vague simply because they fail to delineate a set of factors." Kashem v. Barr,

941 F.3d 358, 372 (9th Cir. 2019).  Here, there *is* a list of information required akin to a set of factors—it is simply non-exhaustive.  Given that a statute entirely lacking a list of factors can still be sufficiently clear, it is likely that a non-exhaustive list is enough.

Plaintiff's other arguments are similarly insufficiently persuasive at this stage, absent a better-developed record, to find a likelihood of success on the merits.  Plaintiff takes issue with an apparent discrepancy between the disclosure requirements for "training" data versus "development" data. (Compl. ¶ 123.)  Determining the meaning of the statute will require further development of the record, including on legislative intent and those terms' usage in the industry.  With respect to which systems the statute covers, Plaintiff questions whether it must make disclosures for licensed systems or incorporated and optimized systems developed by others.  But Plaintiff has not alleged facts to suggest it has systems that fall into those categories.  Plaintiff has been clear that it is presenting an as-applied, not facial, challenge to this statute.  Thus, Plaintiff must actually face such a conundrum—rather than raising an abstract possible issue among AI systems developers—for the Court to make a determination on this issue.

Ultimately, the record at this stage is insufficiently developed for the Court to determine that Plaintiff is likely to succeed on the merits of its vagueness challenge.  Evidence may arise during the course of litigation that eventually requires a different determination.  But the pleadings and record as they stand are not enough at this time.

Because the Court finds Plaintiff has not established a likelihood of success on the merits of its claims, the Court does not consider the remaining preliminary injunction factors, as this consideration is a threshold inquiry.

## V.   CONCLUSION

For the reasons described above, the Court **DENIES** the preliminary injunction.

**IT IS SO ORDERED.**